J-S51009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA :   IN THE SUPERIOR COURT OF
:          PENNSYLVANIA
:
v. :
:
:
:
PATRICK T. HUGHES, :
:
Appellant :   No. 2853 EDA 2017

Appeal from the Judgment of Sentence February 28, 2017
In the Court of Common Pleas of Northampton County
Criminal Division at No.: CP-48-CR-0001892-2015

BEFORE: DUBOW, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY DUBOW, J.:          **FILED APRIL 03, 2019**

Appellant, Patrick T. Hughes, appeals from the Judgment of Sentence entered by the Northampton County Court of Common Pleas following his convictions after a jury trial of First-Degree Murder and Criminal Conspiracy.[1] Appellant raises thirteen issues on appeal, challenging, *inter alia*, the sufficiency and weight of the evidence, the admission at trial of certain evidence, the trial court's denial of various pre-trial Motions, and the legality of his mandatory sentence of life imprisonment without parole. After thorough review, we affirm, adopting in part the trial court's August 15, 2016 and October 30, 2017 Opinions as our own.

On November 23, 2012, the narcotics division of the Easton Police Department was involved in an ongoing investigation targeting the home of

---

[1] 18 Pa.C.S. § 2502(a) and 18 Pa.C.S. § 903, respectively.

Corey Reavis. That day, officers conducted a controlled purchase of heroin from Appellant using a confidential informant. Police officers observed Appellant leave Reavis's home, walk to the informant, engage in a brief hand-to-hand transaction, and return to Reavis's home. When Appellant returned to Reavis's home, police observed Appellant interact with individuals on the front porch, including Omar Robinson. Police took photographs of Appellant, Robinson, and the transaction. Police also observed Robinson's minivan parked outside the residence.

Later that day, Appellant and Robinson shot and killed Ervin Holton ("Victim") in Easton.[2] A witness who was driving near the scene called 911 to report the shooting. She stated that, after hearing the gunshots, she saw two individuals in dark clothing running toward a nearby minivan. The Victim died from multiple gunshot wounds; ballistics evidence confirmed that there were two shooters.

During the subsequent investigation, detectives from the Easton Police Department obtained consistent surveillance video that showed two individuals exit a minivan one block from the crime scene, walk towards the location of the shooting, and shortly thereafter, run back towards the minivan

---

[2] The Victim and Appellant were rival drug dealers and may have been in a dispute about Nicole Greene, a woman they both dated. N.T. Trial, 1/10/17, at 31-32.

- 2 -

and drive away. Police officers also learned that Robinson's girlfriend, Lisa Doorley, owned the minivan.

When police officers located the minivan at Robinson's home, which he shared with Doorley, Robinson confirmed that only he and Doorley drive the minivan, and that he did not allow anyone else to drive the minivan. Upon confirming that he had been driving the minivan on the night of the murder, Robinson started crying. Police searched the minivan with Doorley's consent and found gunshot residue on the steering wheel and the driver's side interior door handle.

Homicide detectives also learned that Appellant and Robinson had spent much of the day together before the murder. Reavis confirmed that he had been hanging out with Appellant and Robinson that day. Reavis admitted that he had driven and dropped off the Victim at a store near the scene of the murder shortly before Appellant and Robinson murdered him.

Also, cell phone records from Appellant and Robinson confirmed their whereabouts in south Easton, where the shooting occurred, and their close proximity to the area and each other when they placed the calls. The eyewitness called 911 at 5:39 P.M., and the cell phone records showed that Appellant and Robinson made numerous calls to Reavis before and after the murder. All calls stopped at the precise time of the shooting, consistent with the surveillance video.

During the investigation, Appellant provided several different, inconsistent, and unsubstantiated alibis to police investigators. After his arrest, Appellant made several incriminating statements to fellow inmates (1) regarding his motive for the murder, and (2) claiming that he and his men were responsible for the murder. Relevant to this appeal, Appellant provided two recorded statements to police after reading and waiving his **Miranda**[3] rights: on December 5, 2012, and December 4, 2014.

Thereafter, the Commonwealth charged Appellant with Criminal Homicide and Criminal Conspiracy. In October 2015, the trial court granted the Commonwealth's Motion to try Appellant and Robinson jointly.

Appellant filed numerous pre-trial motions, including a Motion to Sever his trial from Robinson, a Motion to Suppress his statements to police, and a Motion for Change of Venue. The trial court denied each of these relevant motions.[4]

On August 16, 2016, the Commonwealth filed a Motion *in Limine* seeking to introduce "prior bad acts" evidence pursuant to Pennsylvania Rule of Evidence 404(b) of the drug transaction between the confidential informant and Appellant earlier on the day of the murder. On November 14, 2016, the

---

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[4] The trial court did, however, grant Appellant's Motion to Suppress a December 11, 2012 statement to police because there was no evidence the officers gave **Miranda** warnings to Appellant prior to questioning.

trial court granted the Commonwealth's Motion, concluding that the evidence of the drug deal was relevant and admissible to show: (1) the motive of Appellant and Robinson for the shooting; and (2) the complete story of the case.[5] The trial court also concluded that the probative value of the evidence outweighed its potential for prejudice, particularly with the provision of appropriate cautionary jury instructions. *See* Trial Court Opinion, 11/14/16, at 2-7.

In January 2017, Appellant and Robinson proceeded to an eight-day jury trial. The Commonwealth presented testimony from numerous witnesses, including Reavis, Greene, the Northampton County coroner, numerous detectives and police officers, and James Martin, Appellant's cellmate. Appellant and Robinson did not testify and presented no evidence.

On January 20, 2017, the jury convicted Appellant of First-Degree Murder and Criminal Conspiracy.[6]

---

[5] At trial, the Commonwealth also argued that the motive for the shooting was a romantic rivalry between the Victim and Appellant. N.T. Trial, 1/10/17, at 31-32.

[6] The jury also convicted Robinson of First-Degree Murder and Criminal Conspiracy, and the trial court sentenced him to life imprisonment without parole. Robinson also filed a direct appeal to this Court, which remains pending at docket No. 2790 EDA 2017.

On February 28, 2017, the trial court sentenced Appellant to the mandatory term of life imprisonment without parole.[7] Appellant filed a timely Post-Sentence Motion, which the trial court denied on August 4, 2017.

On August 31, 2017, Appellant filed a Notice of Appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents thirteen issues for our review:

1. Whether the evidence was sufficient to [sustain] a conviction of criminal homicide, criminal conspiracy to commit homicide where the Commonwealth failed to establish, beyond a reasonable doubt, the existence of a conspiratorial agreement, the specific intent of which was to commit criminal homicide, prior to the death of Ervin Holton?

2. Whether the evidence was sufficient to [sustain] a conviction of criminal homicide or criminal conspiracy to commit homicide where the Commonwealth conceded at trial that [Appellant] was not a shooter, and offered no evidence of his presence at the scene, when, a conviction of murder cannot stand without sufficient evidence of accomplice liability?

3. Whether the trial court erred in granting the Commonwealth's motion *in limine* to present evidence of [Appellant's] drug dealing and prior drug arrests under [Pa.R.E.] 404(b) by order and opinion on November 14, 2016?

4. Whether the trial court erred in admitting 911 tapes referencing a Honda Odyssey without affording the Appellant his right to cross-examination guaranteed and by the confrontation clause of the United States Constitution?

5. Whether this honorable court erred when it barred the defense from cross-examining James Martin on his status as a sex offender registrant?

---

[7] 18 Pa.C.S. § 1102(a). The trial court imposed a concurrent term of 20 to 40 years' incarceration for the Criminal Conspiracy conviction.

6. Whether this honorable court erred when it failed to grant Appellant's request for a mistrial due to Nicole Green[e]'s testimony that Appellant was incarcerated during most of the time they dated?

7. Whether the verdict was against the weight of the evidence?

8. Whether the trial court erred over Appellant's objection in denying Appellant's motion for severance, failing to order separate trials, and determining that [] Appellant would not be prejudiced by being tried with his co-defendant Omar Robinson[?]

9. Whether the trial court erred in failing to grant Appellant's motion for change of venue/venire where the pretrial publicity was sustained, pervasive, inflammatory, and inculpatory and there was a presumption of prejudice in selecting a fair and impartial jury from Northampton County?

10. Whether the trial court erred in failing to grant Appellant['s] motion to suppress statements made to police on December 5, 2012 and December 4, 2014?

11. Whether the sentence of the court to a mandatory life sentence without the possibility of parole for First[-]Degree Murder is unlawful where the underlying statute is unconstitutional and the sentencing issue was not presented to the jury?

12. Whether the mandatory sentence of Appellant to life imprisonment without the possibility of parole for murder of the first degree violates the Eighth Amendment prohibition on cruel and unusual punishment?

13. Whether the court erred in denying Appellant's request to instruct the jury that in Pennsylvania the mandatory sentence for First[-]Degree Murder is life imprisonment without the possibility of parole?

Appellant's Brief at 3-5 (capitalization, suggested answers, and some citations omitted).

**Issues 1-2: Sufficiency of the Evidence**

Appellant first challenges the sufficiency of the evidence supporting his convictions for First-Degree Murder and Criminal Conspiracy. Appellant's Brief at 11-12. Appellant generally challenges the elements of identity and specific intent to kill. *Id.*[8]

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000). "We review claims regarding the sufficiency of the evidence by considering whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa. Super. 2017) (internal quotation marks and citations omitted). "Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence." *Id.* "In conducting this review, the appellate court

_____

[8] In his Brief, Appellant "hereby incorporates the entire record as it relates to the within issues as though said portion was set forth herein at length." Appellant's Brief at 11. Our Supreme Court has categorically rejected incorporation by reference as a means of presenting an issue. ***See Commonwealth v. Briggs***, 12 A.3d 291, 342-43 (Pa. 2011) (stating that, where an appellant incorporates prior arguments by reference in contravention of Pa.R.A.P. 2119(a) and (b), he or she waives such claims on appeal). In light of the trial court's thorough review of the issues with reference to the record and relevant case law, we decline to find waiver in this case, and will consider the two-paragraph argument presented in his Brief.

may not weigh the evidence and substitute its judgment for the fact-finder."
*Id.*

It is well-established that to sustain a First-Degree Murder conviction "the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific intent to kill." **Commonwealth v. Hitcho**, 123 A.3d 731, 746 (Pa. 2015); 18 Pa.C.S. § 2502(a). "Section 2502 of the Crimes Code defines murder of the first degree as an 'intentional killing,'" which, in turn, is defined as a "willful, deliberate and premeditated killing." **Commonwealth v. Diamond**, 83 A.3d 119, 126 (Pa. 2013) (citing 18 Pa.C.S. § 2502(a), (d)). A jury may infer the intent to kill based upon the defendant's use of a deadly weapon on "a vital part of the victim's body." **Commonwealth v. Sanchez**, 82 A.3d 943, 967 (Pa. 2013) (citation omitted).

Additionally, "[a] person is legally accountable for the conduct of another person when … he is an accomplice of such other person in the commission of the offense." 18 Pa.C.S. § 306(b)(3). The statute sets forth that "[a] person is an accomplice of another person in the commission of an offense if … with the intent of promoting or facilitating the commission of the offense, he … aids or agrees or attempts to aid such other person in planning or committing it." 18 Pa.C.S. § 306(c)(1)(ii).

Moreover, "[a]ccomplice liability may be established wholly by circumstantial evidence. Only the least degree of concert or collusion in the

commission of the offense is sufficient to sustain a finding of responsibility as an accomplice. No agreement is required, only aid." **Commonwealth v. Mitchell**, 135 A.3d 1097, 1102 (Pa. Super. 2016) (internal quotations marks and citation omitted).

To sustain the conviction for Criminal Conspiracy, there must be proof beyond a reasonable doubt that the defendant "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent[,] and (3) an overt act was done in furtherance of the conspiracy. This overt act need not be committed by the defendant; it need only be committed by a co-conspirator." **Commonwealth v. McCall**, 911 A.2d 992, 996 (Pa. Super. 2006) (citations and quotation marks omitted). **See also** 18 Pa.C.S. § 903 (defining Criminal Conspiracy).

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." **Commonwealth v. Brooks**, 7 A.3d 852, 857 (Pa. Super. 2010). "Evidence of identification need not be positive and certain to sustain a conviction." **Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*) (citation omitted).

Our Supreme Court has stated that "any indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on

circumstantial evidence." ***Commonwealth v. Hickman***, 309 A.2d 564, 566 (Pa. 1973) (citations omitted).

Our review of the record, in the light most favorable to the Commonwealth as the verdict winner, indicates that the evidence was sufficient to support every element of the offenses beyond a reasonable doubt. The Honorable Jennifer R. Sletvold, who presided at the trial, has authored a comprehensive, thorough, and well-reasoned Opinion, citing the record and relevant case law in addressing Appellant's sufficiency claims. ***See*** Trial Court Opinion, filed 10/30/17, at 4-11 (concluding that there is no merit to Appellant's sufficiency claims because: (1) the Victim died from multiple gunshot wounds; (2) ballistics evidence confirmed that there were two shooters; (3) the eyewitness who called 911 and the video surveillance showed that Appellant and Robinson used Doorley's minivan and drove to the area of the shooting, exited the minivan, walked in the direction of the shooting, and then fled back to the minivan and drove away; (4) cell phone records confirmed Appellant and Robinson were together at the time of the shooting and made numerous calls between themselves and Reavis both before and after the murder, but the calls abruptly stopped at the precise time of the murder while Appellant and Robinson were captured on video; (5) Appellant made incriminating statements taking responsibility for the Victim's murder; and (6) other evidence corroborated the motive that Appellant and Robinson killed the Victim because of a romantic rivalry between rival drug

dealers).  We, thus, affirm on the basis of the trial court's October 30, 2017 Opinion.

**Issue 3: Pa.R.E. 404(b) – Prior Bad Acts**

Appellant next challenges the admission of evidence that he sold drugs to a confidential informant the day of the murder.  Appellant's Brief at 12-14. Appellant avers that the Commonwealth offered this evidence of Appellant's prior drug dealing "to arouse the jury to overmastering hostility."  ***Id.*** at 14.

The "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion."  ***Commonwealth v. Tyson***, 119 A.3d 353, 357 (Pa. Super. 2015) (*en banc*) (citations and quotation marks omitted). "Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." ***Commonwealth v. Huggins***, 68 A.3d 962, 966 (Pa. Super. 2013) (citations and internal quotations omitted).

Pennsylvania Rule of Evidence 404(b) prohibits evidence of a defendant's prior bad acts "to prove a person's character" or demonstrate "that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1).  Nevertheless, the Rule also provides that prior bad acts evidence "may be admissible for another purpose, such as proving

- 12 -

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2).

"In order for evidence of prior bad acts to be admissible as evidence of motive, the prior bad acts must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Knox*, 142 A.3d 863, 866-67 (Pa. Super. 2016) (citations and quotation marks omitted). Although consideration of these claims is often very fact dependent, this Court has previously admitted evidence of prior drug deals to establish motive for a subsequent crime. *See*, *e.g.*, *id.* at 867 (concluding the trial court properly admitted evidence of a prior drug transaction between defendant and victim as relevant and probative of defendant-shooter's identity and motive of revenge); *Commonwealth v. Collins*, 70 A.3d 1245, 1252 (Pa. Super. 2013) (concluding trial court did not abuse its discretion in admitting evidence that co-defendants and victim were members of rival drug distribution organizations in order to link them and suggest a motive for the killing, particularly where the trial court issued a cautionary jury instruction).

In addition, Rule 404(b)(2) provides a *res gestae* exception to prior bad acts evidence that "permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts." *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016). "In a criminal case[,] this evidence is admissible only if the probative value of the evidence

outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). ***See also*** Daniel J. Anders, Ohlbaum on the Pennsylvania Rules of Evidence § 404.11 *et seq.* (2019 ed. LexisNexis Matthew Bender).

"Where evidence of prior bad acts is admitted, the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." ***Ivy***, 146 A.3d at 251 (citations omitted). "It is well settled that the jury is presumed to follow the trial court's instructions[.]" ***Commonwealth v. Cash***, 137 A.3d 1262, 1280 (Pa. 2016) (citation omitted).

In this case, the Commonwealth presented evidence that, on the same day of the murder, Appellant and Robinson were together for much of the day. The narcotics division police officers watched as Appellant left Reavis's home, walked to the informant, engaged in a brief hand-to-hand transaction, and returned to Reavis's home where police officers observed Hughes interact with individuals on the front porch, including Robinson. Police officers took photographs of Appellant, the transaction, Robinson, and Robinson's minivan parked outside Reavis's residence.

The trial court concluded that the evidence of the drug transaction was relevant and admissible to show the defendants' motive for the shooting and to complete the story of the case. ***See*** Trial Court Opinion, 11/14/16, at 2-7.

We agree with the trial court's analysis and conclude that this evidence was admissible under Pa.R.E. 404(b)(2) as both motive for the shooting and as *res gestae* evidence. The drug transaction evidence, combined with the

cell phone records, showed that Appellant and Robinson were together on the date of the murder with the minivan at a location targeted by the narcotics division for suspected drug activity. Evidence of their coordinated movements throughout the day supported the Commonwealth's conspiracy allegations against Appellant. Appellant's relationship with Robinson was consistent with the Commonwealth's theory that Appellant enlisted Robinson to help him kill the Victim. Moreover, the evidence was relevant to the circumstances leading up to and including the shooting, *i.e.*, the *res gestae*.

The trial court properly weighed the probative value of the evidence in light of the potential for unfair prejudice in accordance with Pa.R.E. 404(b)(2). Moreover, the trial court provided a cautionary jury instruction explaining the limited purpose of this evidence. **See** N.T. Trial, 1/10/17, at 87-88. We, thus, discern no abuse of the trial court's discretion in admitting this evidence. Appellant is not entitled to relief.

**Issue 4: Admission of 911 Tapes**

Appellant challenges the trial court's admission of 911 tapes containing statements made by eyewitness Christine Sandt and her husband that the shooters fled the scene in a Honda Odyssey. Appellant's Brief at 15-18. Appellant argues that the admission of Mr. Sandt's hearsay statements violated his confrontation right because Mr. Sandt did not testify at trial. ***Id.***, *citing **Crawford v. Washington**,* 541 U.S. 36 (2004), and ***Davis v. Washington***, 547 U.S. 813 (2006).

The "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Tyson*, 119 A.3d at 357 (citations and quotation marks omitted). "Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Huggins*, 68 A.3d at 966 (citations and internal quotations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court of the United States has interpreted the Confrontation Clause to prohibit the admission of "testimonial" statements of a witness who did not appear at trial unless the witness was unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 68. In contrast, regardless of whether the witness is available or was subjected to cross-examination, non-testimonial statements are admissible. *See Davis*, 547 U.S. at 827-29.

In 2006, the United States Supreme Court in *Davis* provided guidance on the distinction between testimonial and non-testimonial statements in the Confrontation Clause context. The *Davis* Court explained that "[s]tatements are nontestimonial when made in the course of police interrogation under

circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." **Davis**, 547 U.S. at 822.

In contrast, statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." **Id.** The U.S. Supreme Court in **Davis** addressed several factors a court should consider when determining whether a statement a person made is testimonial or non-testimonial.

Relevant here, courts have frequently concluded that statements made to 911 operators are non-testimonial under the Confrontation Clause when the primary purpose of the statement is "to describe current circumstances requiring police assistance." **Davis**, 547 U.S. at 827. **See also**, **e.g.**, **Commonwealth v. Williams**, 103 A.3d 354, 363-64 (Pa. Super. 2014).

After a thorough review of the certified record, the applicable law, and the comprehensive and well-reasoned Opinion of the trial court, we conclude that there is no merit to Appellant's claim. Accordingly, we affirm on the basis of the trial court's October 30, 2017 Opinion. **See** Trial Court Opinion, 10/30/17, at 12-15 (concluding that it properly admitted the statements by the eyewitnesses on the 911 call because the statements were "made for the primary purpose of responding to an ongoing emergency" and were, thus,

non-testimonial; the statements were otherwise admissible under the hearsay exceptions as excited utterances and present sense impressions pursuant to the Pennsylvania Rules of Evidence).

**Issue 5: Limitation on Cross-Examination of James Martin**

Appellant claims that the trial court erroneously barred him from questioning James Martin about his status as a "sex offender registrant." Appellant's Brief at 18-20 (citing Pa.R.E. 607). Specifically, Appellant "desired to establish that [Martin] was a Megan's Law tier three sexual offender, that he was in prison for 22 years beginning at the age of 18, that his sentence was 10-20 years for rape, and that subsequently he was sentenced for additional time for escape – attempted escape from a State Correctional Institution." *Id.* at 18. Likening Martin's status to probation or parole, Appellant argues that "such an individual witness may wish to testify favorably for the Commonwealth in order to avoid" a violation and this information was relevant to Martin's credibility. *Id.* at 18-20.

"[A] ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Huggins*, 68 A.3d at 966 (citation and internal quotation marks omitted).

Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than

it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence that is not relevant is not admissible." Pa.R.E. 402. In addition, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Under our Rules of Evidence, "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these Rules." Pa.R.E. 607(b). As the Comment to Rule 607 indicates, "Pa.R.E. 607(b) applies the test for relevant evidence of Pa.R.E. 401 to evidence offered to impeach the credibility of a witness." Comment to Pa.R.E. 607.

After a thorough review of the certified record, the applicable law, and the comprehensive and well-reasoned Opinion of the trial court, we conclude that there is no merit to Appellant's claim. Accordingly, we affirm on the basis of the trial court's October 30, 2017 Opinion. **See** Trial Court Opinion, 10/30/17, at 16-18 (concluding that it properly limited Appellant's cross-examination of Martin because: (1) the Commonwealth's direct examination did not elicit any facts "that would have opened the door for this testimony[;]" (2) Martin's status as a sex offender registrant "would have been entirely irrelevant[;]" (3) Appellant "had no case law which indicated that a status as

- 19 -

a sex offender registrant was equivalent to that of being on probation[;]" (4) Appellant had "sufficient opportunity" to question Martin about "any potential motivation he may have had for testifying favorably for the Commonwealth[;]" and (5) Appellant cross-examined Martin about "bias and why he might have cooperated with the Commonwealth[,]" as well as "the charges he believed he was facing in terms of jail time at the time he cooperated with the Commonwealth, the minimum and maximum sentences possible for those crimes, as well as the ultimate sentence that he received.").

**Issue 6: Greene's Testimony about Appellant's Incarceration**

Appellant asserts that the trial court erred when it failed to grant his request for a mistrial after Commonwealth witness Nicole Greene blurted out, in response to a question about whether her relationship with Appellant was intense, that Appellant "was in jail most of the time that we were together." Appellant's Brief at 20-21. **See also** N.T. Trial, 1/13/17, at 207. Appellant states that "it must be presumed that an individual who was in jail from 2005 through 2012 must have a substantial criminal record history and the reference was not simply to a single reference to the fact that he was incarcerated." Appellant's Brief at 21. As a result, Appellant claims that he "was deprived of a fair [t]rial and no curative instruction by the [c]ourt could cure it. In fact, the curative instruction was a reminder for the [j]ury to embellish." **Id.**

This Court reviews the denial of a motion for a mistrial based on a reference to the defendant's past incarceration for an abuse of discretion. *Commonwealth v. Kerrigan*, 920 A.2d 190, 199 (Pa. Super. 2007) (citation and quotation omitted). "[G]enerally no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a previous crime[.]" *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003) (citation omitted).

Relevant considerations for determining whether to grant a mistrial include "the nature of the reference and whether the remark was intentionally elicited by the Commonwealth[.]" *Kerrigan*, 920 A.2d at 199. A "passing reference" to a prior conviction or incarceration is insufficient to require a mistrial. *Id.* at 200; *see also Commonwealth v. Guilford*, 861 A.2d 365, 370 (Pa. Super. 2004) (holding that two passing references to prior criminal activity did not require a mistrial).

"[T]he possible prejudicial effect of a witness's reference to the prior criminal conduct of a defendant may, under certain circumstances, be removed by an immediate cautionary instruction to the jury." *Commonwealth v. Pursell*, 495 A.2d 183, 192 (Pa. 1985).

We have reviewed the record, the applicable law, and the trial court's Opinion, and we conclude that there is no merit to Appellant's claim. Accordingly, we affirm on the basis of the trial court's October 30, 2017 Opinion. *See* Trial Court Opinion, 10/30/17, at 18-20 (concluding that it

properly denied Appellant's mistrial motion because: (1) Greene's statement was a single passing reference to Appellant's incarceration; (2) Greene did not state when or why Appellant had been incarcerated; (3) Appellant immediately objected and cut off her testimony; (4) the prosecutor "did not intentionally elicit the information" because Greene's answer was not responsive to the question and the Commonwealth "unequivocally stated several times on the record that the subject remark regarding Appellant's jail time was something Ms. Greene blurted out after being advised and warned about[;]" (5) the Commonwealth cautioned Greene again to refrain from mentioning Appellant's prior incarceration or convictions before she resumed her testimony; (6) the reference "was not so prejudicial as to warrant a mistrial[;]" and (7) the jury followed the trial court's prompt curative instruction).

**Issue 7: Weight of the Evidence**

In his next issue, Appellant challenges the weight of the evidence because the "[t]he evidence and testimony of Nicole Green[e] and James Martin shocked the sense of fairness and conscious of justice. The testimony of a snitch, James Martin, and Appellant's girlfriend for many years while in jail was relied on by the [j]ury in a verdict that is devoid of justice." Appellant's Brief at 22.[9]

_____

[9] In his Brief, Appellant again "incorporates the record made before the [t]rial [c]ourt to support his claim." Appellant's Brief at 22. As previously stated, Pennsylvania appellate courts categorically reject incorporation by reference

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (quotation marks and citation omitted). Resolving questions of credibility and contradictory testimony are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa. Super. 2000). It is well settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, 129 A.3d at 546.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.* at 545-46. "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is [or is not] against the weight of the evidence." *Id.* at 546. "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was

---

as a means of presenting an issue and we will consider only the argument presented to this Court in Appellant's Brief. *See Briggs*, 12 A.3d at 342-43.

not against the weight of the evidence and that a new trial should be granted in the interest of justice." ***Id.***

Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Id***. (citation and internal quotation marks omitted). As our Supreme Court has made clear, reversal is only appropriate "where the facts and inferences disclose a **palpable abuse of discretion**[.]" ***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014) (citations omitted, emphasis in original).

A defendant concedes that sufficient evidence supports the verdict in a true challenge to the weight of the evidence and instead questions which evidence the fact-finder should have believed. ***Commonwealth v. Thompson***, 106 A.3d 742, 758 (Pa. Super. 2014). For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner, and may instead use its discretion in concluding whether the verdict was against the weight of the evidence. ***Commonwealth v. Widmer***, 744 A.2d 745, 751 n.3 (Pa. 2000).

After a thorough review of the certified record, the briefs of the parties, the applicable law, and the comprehensive and well-reasoned trial court Opinion, we conclude that there is no merit to Appellant's challenge to the weight of the evidence. The trial court carefully evaluated the record and the

evidence in denying Appellant's weight claim. *See* Trial Court Opinion, 10/30/17, at 20-22.

Appellant essentially asks us to reassess the credibility of the two witnesses and reweigh the testimony and evidence presented at trial. We cannot and will not do so. Our review of the record shows that the evidence is not tenuous, vague, or uncertain, and the verdict was not so contrary to the evidence as to shock the court's conscience.

We discern no abuse of discretion in the trial court's denial of Appellant's weight claim. Accordingly, Appellant is not entitled to relief.

**Issue 8: Denial of Motion to Sever**

Appellant avers that the trial court erred in denying his motion to sever his case from co-defendant Robinson's case. Appellant's Brief at 22-23. Appellant claims he and Robinson "may have had antagonistic defenses where the jury, in order to believe the testimony offered on behalf of one defendant, must disbelieve the testimony offered by each co-defendant." *Id.* at 23 (citation omitted). Appellant baldly claims that "a joint trial prohibited [him] from introducing evidence to the allegations against him and to demonstrate his innocence to these allegations." *Id.*

A trial court's denial of a motion for severance rests within the sound discretion of the trial court, and we will not disturb its decision on appeal "absent a manifest abuse of discretion." *Commonwealth v. Mollett*, 5 A.3d 291, 305 (Pa. Super. 2010) (quotation and citation omitted).

Rule of Criminal Procedure 583 provides that "[t]he court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583. When considering a motion to sever, a trial court must determine: (1) "whether the evidence of each of the offenses would be admissible in a separate trial for the other;" (2) "whether such evidence is capable of separation by the jury so as to avoid danger of confusion;" and (3) "if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses." *Commonwealth v. Kunkle*, 79 A.3d 1173, 1190 (Pa. Super. 2013) (quotation and citations omitted).

"The critical consideration is whether the appellant was prejudiced by the trial court's decision not to sever. The appellant bears the burden of establishing such prejudice." *Mollett*, 5 A.3d at 305 (quotation and citation omitted). Prejudice in this context is "that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." *Commonwealth v. Boyle*, 733 A.2d 633, 637 (Pa. Super. 1999) (quotation and citation omitted).

After carefully reviewing of the record, the applicable law, and the trial court's Opinion, we find that Appellant is not entitled to relief on this meritless claim. Accordingly, we affirm on the basis of the trial court's August 15, 2016

Opinion. *See* Trial Court Opinion, 8/15/16, at 17-21 (concluding that it properly denied Appellant's motion for severance because: (1) Appellant "does not elaborate" or explain how specific defenses are antagonistic and irreconcilable and the request "is predicated upon an undefined theory of possibilities[;]" (2) Appellant failed to "specify why a joint trial would be prejudicial[;]" and (3) the prosecutor "indicated that there is 'but one possible statement' that may implicate the [d]efendants together which statement may be redacted[.]").

**Issue 9: Denial of Motion for Change of Venue**

Appellant claims that the trial court erred in denying his motion for change of venue or venire. Appellant's Brief at 24-25. Relying on thirty-five local newspapers articles about the murder published over four years, Appellant argues that the "pretrial publicity was sustained, pervasive, inflammatory, and culpatory and there is a presumption of prejudice in selecting a fair and impartial jury in Northampton County." *Id.* at 25.

Pennsylvania Rule of Criminal Procedure 584 governs requests for changes of venue and provides that a trial court "may" grant a motion for change of venue or venire "when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584(A).

A trial court's denial of a motion for change of venue or venire rests within the sound discretion of the trial judge, and we will not disturb its ruling

on appeal absent an abuse of that discretion. *Commonwealth v. Brookins*, 10 A.3d 1251, 1258 (Pa. Super. 2010). "In reviewing the trial court's decision, our inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity." *Commonwealth v. Drumheller*, 808 A.2d 893, 902 (Pa. 2002).

"Normally, one who claims that he has been denied a fair trial because of pretrial publicity must show actual prejudice in the empanelling of the jury." *Id.* We will presume prejudice in certain extreme cases where such pretrial publicity is pervasive or inflammatory. *Id.* Our Supreme Court has held that courts will presume prejudice if: "(1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." *Id.*

Even presuming such prejudice exists, a defendant must "also show[] that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Id.* In examining whether there has been a sufficient cooling period, courts must examine "what a panel of prospective jurors has said about its exposure to the publicity in question." *Id.* at 902-03.

After a thorough review of the certified record, the applicable law, and the comprehensive and well-reasoned Opinion of the trial court, we hold that Appellant is not entitled to any relief on this claim. Accordingly, we affirm on the basis of the trial court's August 15, 2016 Opinion. **See** Trial Court Opinion, 8/15/16, at 14-17 (concluding that it properly denied Appellant's motion because: (1) the thirty-five articles over four years referenced police reports and statements by law enforcement personnel about the incident; (2) Appellant failed to meet "his burden in demonstrating that the pretrial publicity regarding this case has been so prejudicial as to preclude the empaneling of a fair and impartial jury[;]" (3) any biased or prejudiced jurors based on the pretrial publicity would be (and were) questioned during *voir dire*; and (4) Appellant was free to renew his motion during *voir dire* if such bias or prejudice became apparent.[10]).

**Issue 10: Denial of Motion to Suppress Appellant's Statements**

Appellant argues that the court erred in denying his Motion to Suppress. Appellant's Brief at 25-26. Appellant claims that "based on the totality of the circumstances, his [December 5, 2012 and December 4, 2014] statement[s] could not be knowing, intelligent, and voluntary." **Id.** at 26.

---

[10] Moreover, the trial court investigated whether there had been a sufficient cooling off period during *voir dire* and confirmed that the pretrial publicity read by just four members of the jury panel "would not affect their ability to be fair and impartial jurors in this case." **See** Trial Court Opinion, 10/30/17, at 22-23.

- 29 -

In reviewing the denial of a motion to suppress, we are limited to considering only the Commonwealth's evidence and "so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." ***Commonwealth v. McCoy***, 154 A.3d 813, 815-16 (Pa. Super. 2017) (citations omitted). Where the testimony and other evidence supports the court's findings of fact, we are bound by them and "may reverse only if the court erred in reaching its legal conclusions based upon the facts." ***Id.*** at 816 (citations omitted). It is within the exclusive province of the suppression court to "pass on the credibility of witnesses and determine the weight to be given to their testimony." ***Id.*** (citations omitted). This Court will not disturb a suppression court's credibility determination absent a clear and manifest error. ***Commonwealth v. Camacho***, 625 A.2d 1242, 1245 (Pa. Super. 1993).

"The scope of review from a suppression ruling is limited to the evidentiary record created at the suppression hearing." ***Commonwealth v. Neal***, 151 A.3d 1068, 1071 (Pa. Super. 2016), *citing **In re L.J.***, 79 A.3d 1073, 1087 (Pa. 2013).

Importantly, "[o]nce a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." ***Commonwealth v. Wallace***, 42 A.3d 1040, 1047-48 (Pa. 2012) (citations omitted); ***see also*** Pa.R.Crim.P. 581(H).

It is the Commonwealth's burden to establish that a defendant "knowingly and voluntarily waived his *Miranda* rights." *Commonwealth v. Johnson*, 42 A.3d 1017, 1029 (Pa. 2012). A defendant must explicitly waive his *Miranda* rights by making an "outward manifestation" of that waiver. *Commonwealth v. Cohen*, 53 A.3d 882, 886 (Pa. Super. 2012). A suppression court may properly find that *Miranda* rights have been waived where the totality of the circumstances shows "an uncoerced choice and the requisite level of comprehension[.]" *In re T.B.*, 11 A.3d 500, 505-06 (Pa. Super. 2010) (citation omitted).

After a thorough review of the certified record, the applicable law, and the comprehensive and well-reasoned Opinion of the trial court, we conclude that there is no merit to Appellant's suppression claim. Accordingly, we affirm on the basis of the trial court's August 15, 2016 Opinion. *See* Trial Court Opinion, 8/15/16, at 21-25, 27-29 (concluding that there is no merit to Appellant's suppression claims because, *inter alia*, Appellant "was properly advised of his *Miranda* rights, including the right to have counsel present, and that he waived same prior to these interviews.").

**Issues 11-12: Legality of Sentence**

In his eleventh and twelfth issues, Appellant challenges the legality of his sentence and presents several consolidated arguments. Appellant argues that: (1) his sentence constitutes cruel and unusual punishment; (2) he is entitled to relief pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012); and

(3) "mandatory sentencing is unlawful" because "the [j]ury never determined the mandatory sentence pursuant to" ***Alleyne v. United States***, 570 U.S. 99 (2013). Appellant's Brief at 26-29. We address these claims *seriatim*.

First, our statutes provide that "a person who has been convicted of a murder of the first degree . . . shall be sentenced to death or to a term of life imprisonment[.]" 18 Pa.C.S. § 1102(a)(1). This Court has previously held that "[a] mandatory life sentence, as established by the legislature, is clearly not cruel and unusual punishment for the crime of first-degree murder." ***Commonwealth v. Waters***, 483 A.2d 855, 861 (Pa. Super. 1984).

Second, ***Miller*** does not entitle Appellant to any relief. In ***Miller***, the U.S. Supreme Court held that it is unconstitutional for state courts to impose an automatic life sentence without possibility of parole upon a homicide defendant for a murder committed while the defendant was under 18 years of age.

As Appellant recognizes, this Court has previously ruled that ***Miller*** does not apply to individuals who were 18 or older at the time they committed murder. ***See Commonwealth v. Cintora***, 69 A.3d 759, 764 (Pa. Super. 2013) (holding that petitioners who were eighteen or older at the time they committed murder are not within the ambit of the ***Miller*** decision), *abrogated in part by* ***Montgomery v. Louisiana***, 136 S.Ct. 718 (2016);[11] ***see also***

---

[11] The United States Supreme Court held in ***Montgomery*** that its decision in ***Miller*** applies retroactively.

*Commonwealth v. Furgess*, 149 A.3d 90 (Pa. Super. 2016) (holding that *Miller* did not apply to a 19–year–old appellant convicted of homicide, even though that appellant claimed he was a "technical juvenile" and relied on neuroscientific theories regarding immature brain development to support his claim; acknowledging that additional holding in *Cintora*, that *Miller* had not been applied retroactively, was "no longer good law" after *Montgomery*).

Appellant, born August 4, 1978, was 34 years old on November 23, 2012, when he and Robinson murdered Holton. Thus, *Miller* is inapplicable to Appellant.

Third, *Alleyne* does not warrant any relief. The U.S. Supreme Court held in *Alleyne* that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury and proved beyond a reasonable doubt. *Alleyne*, 570 U.S. at 114-15.

*Alleyne* is not applicable to the instant case. Appellant received a mandatory sentence pursuant to 18 Pa.C.S. § 1102(a). Thus, the only "fact" that led to Appellant's life sentence was his jury conviction of First-Degree Murder; the trial court engaged in no fact-finding at sentencing. Because Appellant's mandatory sentence of life imprisonment was based on his conviction, and not on any aggravating fact, his sentence is not unconstitutional under *Alleyne*. *See Commonwealth v. Resto*, 179 A.3d 18, 20-21 (Pa. 2018) (OAJC) (upholding judgment of sentence where

mandatory minimum was based on conviction and explaining that "a conviction returned by a jury to which a mandatory minimum sentence directly attaches is not the same as an aggravating fact that increases a mandatory minimum sentence.").

Based on the foregoing, we conclude that Appellant is not serving an illegal sentence and he is not entitled to relief.

**Issue 13: Jury Instruction about Mandatory Sentence**

In his thirteenth and final issue, Appellant claims that the trial court erred when it denied his request "to instruct the [j]ury that the mandatory sentence in Pennsylvania for a conviction of [First-]Degree Murder is life imprisonment without the possibility of parole." Appellant's Brief at 29.

We review a trial court's refusal to give a requested jury instruction to "determine whether the record supports the trial court's decision." *Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (quotation omitted). We must determine "whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Id.* (quotation omitted).

It is well settled that a "trial court has wide discretion in fashioning jury instructions." *Id.* (quotation omitted). The trial court need not provide every instruction requested by a party, and this Court will not reverse the refusal to provide a requested instruction unless the refusal prejudiced Appellant. *Id.*

This Court will conclude that a jury charge was "erroneous only if the charge as a whole is inadequate, not clear[,] or has a tendency to mislead or confuse, rather than clarify, a material issue." *Id.* (quotation omitted). We will hold that a charge was inadequate only where the court "palpably misled" the jury "or there is an omission which is tantamount to fundamental error." *Id.* (quotation omitted).

Regarding jury instructions about mandatory sentences, this Court has recognized that "punishment is a matter solely for the court and not for the jury to know or [to] consider during its deliberations." *Commonwealth v. White*, 504 A.2d 930 (Pa. Super. 1986) (citing *Commonwealth v. Lucier*, 225 A.2d 890, 891 (Pa. 1967)). "[T]he jury has nothing to do with the punishment of an offense[.]" *White*, 504 A.2d at 930.

After reviewing the certified record, the applicable law, and the trial court's Opinion, we reject Appellant's claim as meritless. We affirm on the basis of the trial court's October 30, 2017 Opinion. *See* Trial Court Opinion, 10/30/17, at 25-26 (concluding that there is no merit to Appellant's claim because, *inter alia*, the "[c]ourt clearly and accurately instructed the jury that the verdict should be based on evidence and not on what the penalty might be in the event of a conviction.").

The parties are instructed to attach a copy of the trial court's August 15, 2016 and October 30, 2017 Opinions to all future filings.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/3/19

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

vs.

PATRICK T. HUGHES,

Appellant.

No. 2853 EDA 2017

Trial Court No.: CR-1892-2015

## MEMORANDUM OPINION

### I. Introduction

This Memorandum Opinion is filed in accordance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. Following an eight-day jury trial before the undersigned judge, the Appellant, Patrick Hughes (hereinafter, "Appellant"), was found guilty of criminal homicide as murder of the first degree, in violation of 18 Pa.C.S.A. § 2501[1]; and criminal conspiracy to commit murder of the first degree, in violation of 18 Pa.C.S.A. § 903 A1. These crimes arose out of Appellant's role in the shooting death of Ervin Holton (hereinafter, "Holton") on November 23, 2012 in the City of Easton, Pennsylvania.

For purposes of trial, Appellant's criminal information was joined with the criminal information of Omar Robinson (hereinafter, "Robinson"), who was charged with Criminal

---

[1] Appellant was charged with Criminal Homicide for soliciting his co-conspirator and co-defendant, Omar Robinson, to commit the criminal homicide and/or aiding, agreeing, or attempting to aid Robinson in planning or committing same.

1

Homicide, in violation of 18 Pa.C.S.A. § 2501[2] and Criminal Conspiracy to Commit Criminal Homicide, in violation of 18 Pa.C.S.A. § 903 A1. Both Appellant and Robinson were convicted as charged.

This Court sentenced Appellant on February 28, 2017 as follows: 1) for the charge of murder in the first degree, to serve a term of life imprisonment without the possibility of parole in a Pennsylvania state correctional institution; and 2) for the charge of criminal conspiracy to commit criminal homicide as murder in the first degree, to a concurrent period of incarceration of twenty (20) to forty (40) years in a Pennsylvania state correctional institution.

On March 8, 2017, Appellant filed a Post-Sentence Motion Pursuant to Rule 720(B). We denied this Motion on August 4, 2017. Appellant filed a Notice of Appeal to the Superior Court of Pennsylvania on August 31, 2017. Thereafter, on September 11, 2017, Appellant filed a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

## II. Matters Complained of on Appeal

In his Concise Statement of Matters Complained of on Appeal, Appellant contends that this Court erred as a matter of law and/or fact, stating the following as issues in error:

1. "Whether the evidence was sufficient to [sic] a conviction of Criminal Homicide, Criminal Conspiracy to Commit Homicide where the Commonwealth failed to establish, beyond a reasonable doubt, the existence of a conspiratorial agreement, the specific intent of which was to commit criminal homicide, prior to the death of Ervin Holton?";

2. "Whether the evidence was sufficient to [sic] a conviction of Criminal Homicide or Criminal Conspiracy to Commit Criminal Homicide where the Commonwealth conceded at Trial that Patrick Hughes was not a shooter, and offered no evidence of his presence at the scene, when, a conviction of murder cannot stand without sufficient evidence of accomplice liability?";

---

[2] Robinson was charged with Criminal Homicide for intentionally, knowingly, recklessly or negligently causing the shooting death of Holton.

2

3  "Whether the Trial Court erred in granting the Commonwealth's Motion in Limine to present evidence of Patrick Hughes' drug dealing and prior drug arrests under Pa.R.P.E. [sic] 404(B) by Order and Opinion on November 14, 2016?";

4  "Whether the Trial Court erred in admitting 911 tapes referencing a Honda Odyssey without affording the Defendant his right to cross-examination guaranteed and [sic] by the Confrontation Clause of the United States Constitution? *Crawford v. Washington, 541 U.S. 36 (2004) and its progeny*" [sic] (emphasis in original);

5  "Whether this Honorable Court erred when it barred the Defense from cross-examining James Martin on his status as a sex offender registrant?  See generally Pa.R.E. 607; *Commonwealth v. Cox*, A.2d 923 (Pa. 1999); *Commonwealth v. Murphy*, 591 A.2d 278 (Pa. 1991); *Commonwealth v. Harris*, 852 A.2d 1168 (Pa. 2004)" (emphasis in original);

6  "Whether this Honorable Court erred when it failed to grant Defendant's request for a mistrial due to Nicole Green's [sic] testimony that Defendant was incarcerated during most of the time they dated?  [N.T., 1/13/17, Page 207-208.]";

7  "Whether the verdict was against the weight of the evidence.";

8  "Whether the Trial Court erred over Defendant's objection in denying Defendant's Motion for Severance, failing to order separate Trials, and determining that your Defendant would not be prejudiced by being tried with his Co-Defendant, Omar Robinson:  See Pa.R.Crim.P. Rule 583";

9  "Whether the Trial Court erred in failing to grant Defendant's Motion for Change of Venue/Venire where the pretrial publicity was sustained, pervasive, inflammatory, and inculpatory and there was a presumption of prejudice in selecting a fair and impartial jury from Northampton County?  See *Commonwealth v. Bridges, 757 A.2d 859, 871 (Pa.Super. 2000)*" (emphasis in original);

10 "Whether the Trial Court erred in failing to grant Defendant, Hughes', motion to suppress statements made to police on December 5, 2012 and December 4, 2014?";

11 "Whether the sentence of the Court to a mandatory life sentence without the possibility of parole for first degree murder is unlawful where the underlying statute is unconstitutional and the sentencing issue was not presented to the jury? *Alleyne v. United States, 133 S.Ct. 2151 (2013); 18 Pa. C.S.A. §1102, 42 Pa.C.S.A. §9711*" (emphasis in original);

3

12  "Whether the mandatory sentence of Defendant to life imprisonment without the possibility of parole for Murder of the First Degree violates the Eighth Amendment Prohibition on cruel and unusual punishment?";

13  "Whether the Court erred in denying Defendant's request to instruct the Jury that in Pennsylvania the mandatory sentence for first degree murder is life imprisonment without the possibility of parole."

We will address below Appellant's statements of matters complained of on appeal as he has presented them.

### III.  Discussion

1.  **"Whether the evidence was sufficient to [sic] a conviction of Criminal Homicide, Criminal Conspiracy to Commit Homicide where the Commonwealth failed to establish, beyond a reasonable doubt, the existence of a conspiratorial agreement, the specific intent of which was to commit criminal homicide, prior to the death of Ervin Holton?"**

2.  **"Whether the evidence was sufficient to [sic] a conviction of Criminal Homicide or Criminal Conspiracy to Commit Criminal Homicide where the Commonwealth conceded at Trial that Patrick Hughes was not a shooter, and offered no evidence of his presence at the scene, when, a conviction of murder cannot stand without sufficient evidence of accomplice liability?"**

The standard to apply in determining the sufficiency of the evidence is whether, "viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined that all of elements of the crime to have been established beyond a reasonable doubt." *Com. v. Keblitis*, 500 Pa. 321, 456 A.2d 149 (1983).  Further, our Superior Court has stated:

> "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa. Super. 2005). Nevertheless, "the Commonwealth need not establish guilt to a mathematical certainty." *Id.; see also Commonwealth v. Aguado*, 760 A.2d 1181, 1185 (Pa. Super. 2000) ("[T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence"). Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the

4

combined circumstances. *See Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001).

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. *See Brewer*, 876 A.2d at 1032. Accordingly, "[t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence." *Id.* (quoting *Commonwealth v. Murphy*, 795 A.2d 1025, 1038–39 (Pa. Super. 2002)). Significantly, (the appellate court) may not substitute … judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld. *See Brewer*, 876 A.2d at 1032.

*Com. v. Rahman*, 75 A.3d 497, 500-01 (Pa. Super. 2013) (citing *Com. v. Pettyjohn*, 64 A.3d 1072 (Pa. Super. 2013) (citations omitted)).

In the instant case, the Commonwealth presented sufficient evidence in order to sustain convictions against Appellant for both Criminal Homicide for intentionally, knowingly, recklessly or negligently causing the shooting death of Holton on November 23, 2012; and Criminal Conspiracy to Commit Criminal Homicide for conspiring with Robinson to cause the death of Holton. As further discussed below, all evidence presented at trial, including the testimony of multiple witnesses presented at trial, establish that Appellant caused the shooting death of Holton on November 23, 2012.

A person commits the crime of criminal homicide and violates 18 Pa. C.S. § 2501 (a) "if he intentionally, knowingly, recklessly or negligently causes the death of another human being." To sustain a criminal conspiracy conviction, the Commonwealth must establish that a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903;[3] *Com. v.*

---

[3] Section 903 provides, in relevant part:
> (a) Definition of conspiracy.–A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

5

*Rios*, 546 Pa. 271, 684 A.2d 1025, 1030 (1996). The overt act need not accomplish the crime - it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. *Com. v. Weimer*, 602 Pa. 33, 38–39, 977 A.2d 1103, 1105–06 (2009). Notably, it is of no consequence whether or not Appellant was a shooter – he can be held criminally liable for conduct committed by another by being a member of a conspiracy or by being an accomplice of the person who actually commits the crime at issue. Further, and in response to Appellant's argument herein:

> a person who is an accomplice will not be responsible for a crime if, and only if, the person, before the other person commits the crime, either stops his or her own efforts to promote or facilitate the commission of the crime and either wholly deprives his or her previous efforts of effectiveness in the commission of the crime or gives timely warning to the law enforcement authorities or otherwise makes a proper effort to prevent the commission of the crime.

Pa. SSJI (Crim), §8.306(a)(1) (2016); *see also Com. v. Kimbrough*, 872 A.2d 1244, 1253 (Pa. Super. 2005) (citing 18 Pa.C.S.A. §306 (f)(3)). In the case *sub judice*, Appellant did not offer evidence which would demonstrate that he either stopped and/or wholly deprived his previous efforts of effectiveness in the commission of the murder.

The evidence presented at trial, including the extensive testimony of multiple witnesses, was sufficient to enable the jury to find that all of the elements of the charged offenses were established beyond a reasonable doubt. Detectives from the Easton Police Department reported to a residence on the south side of Easton in response to a 911 call that was made at approximately 5:45 p.m. on November 23, 2012. Notes of Testimony (N.T.), 1/12/17, at p. 73; N.T., 1/17/17 at pp. 42, 45. The 911 call revealed that a witness, Christine Sandt, heard gunshots fired when she was driving in the City of Easton across the street from the Sole Mio Restaurant and observed two individuals in dark

---

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime ...

6

clothing running toward a minivan. N.T., 1/12/17, at pp. 73-75; N.T., 1/17/17, at pp. 42-43, 46-47; *See also* Com. Exhibit 12.

At the scene, the detectives identified Holton as the victim. N.T., 1/10/17, at p. 102. The coroner determined that the cause of death was a homicide by multiple gunshot wounds. *Id.* at p. 156. An expert in forensic pathology, Dr. Zhongxue Hua, M.D., testified that an autopsy of Holton's body revealed that there were six wounds caused by five shots fired at Holton. N.T., 1/12/17, at pp. 128-129. Dr. Hua testified that a bullet that entered Holton from "the left side armpit area cross midline into the left lung into the midline major blood vessel into the right upper and lower portion, subsequently exit in the right side of the back" was the fatal gunshot wound. *Id.* at p. 124.

Further, Detectives Darren Snyder, Christopher Miller and Matthew Rush, who are employed with the City of Easton Police Department, testified regarding video surveillance from the evening of the shooting. The video depicted two individuals exit a dark-colored minivan about a block away from the crime scene, walk in the direction of the scene, then run back toward the minivan in the area of the Sole Mio Restaurant and drive away minutes later. N.T., 1/12/17, at pp. 181, 212; N.T., 1/13/17, at pp. 10, 12; N.T., 1/17/17 at pp. 143-145. The Commonwealth also presented evidence that Appellant and Robinson were the individuals seen in the video surveillance. Robinson's girlfriend, Ms. Doorley, was the owner of a dark-colored minivan. N.T., 1/12/17, at pp. 189-192. When Detectives Miller and Rush went to search the minivan at the home of Robinson and Ms. Doorley, Robinson indicated that he was the operator of the minivan on the date of the homicide, and he became emotional when he was questioned further about the incident. *Id.* at pp. 194-195, 196-197, 219-220. A search of the minivan revealed gunshot residue on the steering wheel and the driver's side interior door handle. N.T., 1/11/17 at p. 125.

Testimony from an individual named Corey Reavis (hereinafter, "Reavis") established that Appellant and Robinson were together during the afternoon on the date of the homicide. Reavis

7

testified that, subsequent to "hanging out" with Appellant and Robinson at his house on that day, just before the shooting occurred, he drove Holton to a location near the residence where Holton was shot. N.T., 1/13/17, at pp. 190, 192-193, 196.

Cell phone records confirmed that Appellant and Robinson had been making several phone calls between themselves and Reavis shortly before the time of the homicide, but at approximately 5:39 p.m. – just before the time that the 911 call was made– all calls between them ceased, only to resume again minutes following reports of the shooting. N.T., 1/12/17, at pp. 15-16, 19-20, 22-25. The cell phone records also evidenced that Appellant and Robinson were in close proximity to one another when the calls were made because the calls were being transmitted from the cell tower located on the south side of Easton. *Id.* at pp. 15-16.

Other testimony confirmed that Appellant and Robinson were together during the afternoon on the date of the homicide. Specifically, the vice unit of the Easton Police Department was investigating Appellant on that day. As a result of this vice investigation, photographs were taken showing that Appellant made a hand-to-hand drug transaction and then went to a house located several minutes from the murder scene. Detective Arrendondo testified that he observed a Honda Odyssey, parked outside of this house. N.T., 1/12/17, at pp. 140-145.

The police investigation further disclosed that Appellant had provided several different and inconsistent alibis as to where he was on the day of the homicide, none of which the detectives could substantiate. N.T., 1/18/17, at p. 7. Detective Darren Snyder conducted an interview of Appellant. Detective Snyder testified as follows:

> When I first asked him where were you on this date, it's a significant date we're talking about, Black Friday, the day after Thanksgiving. This is less than two weeks afterwards. When I first spoke to him, his first indication was he was at his girlfriend's the entire day. Then the photographs and make the purchase or the sale by the vice detectives, then he changed his story. [sic] I was at my girlfriend's house from 3 p.m. until 8:30 p.m. when I went to my other girlfriend's house. During the course of speaking with him, again it continued to evolve to, I was selling drugs to a guy name [sic] Mike; in this case he did.

8

However, that was earlier in the morning not at the time his homicide occurred. Then he changed his story again that he sold to a white guy named Dan and he provided me a description, at Center and Berwick Street, which is near where it happened but still a significant distance away. Speaking to him further, he admits to driving by the victim's house shortly before the homicide occurs. He also says that he sees Sabree,[4] the person who drove up to – the victim up to the scene. He also indicates that he would have been driving. By his own words, he admits that he was probably driving by the scene around the time the homicide occurs. This evolution of where it's at to me it struck me as it kept changing. Any time I threw something else at him, it would change to adapt to whatever I was saying. That was, to me, a significant event in there.

*Id.* at pp. 7-9.

Timothy Graves (hereinafter, "Graves"), an inmate incarcerated in a state correctional facility who shared a prison transport with Appellant, testified that Appellant boasted to him about the fact that he had prepared an alibi for the time of the homicide. N.T., 1/17/17, at pp. 88, 92. Appellant indicated to Graves that the reason for the instant homicide was because Appellant felt disrespected by the actions of a girl he was seeing while he was incarcerated. *Id.* at pp. 90-92. Graves testified that Appellant stated to him that "his mans handled that." When Appellant made this statement to Graves, Graves testified that Appellant used a hand gesture to give the impression that Appellant's "mans" shot the new boyfriend of Appellant's ex-girlfriend. *Id.* at p. 92.

Multiple letters that Appellant wrote to the girl referred to in Graves' testimony, Nicole Greene, were submitted at trial. In these letters, Appellant professed his love to Ms. Greene. *See* Com. Exhibit 47 B; *see also* N.T. 1/18/17 at pp. 27-61.

Appellant's cellmate, James Martin, testified at trial regarding what Appellant told him about this case. The testimony was as follows:

| Attorney Pepper: | Did he tell you anything about it after reading that newspaper article about the murder in this case? |
|---|---|
| Martin: | Not at first. It was like a couple days later, and I don't know how the conversation started but it came up, the homicide, you know, with the boy. It was a big thing about Larry Holmes about putting up for the |

[4] Sabree is Corey Reavis' nickname. N.T., 1/13/17, at p. 198.

|                      |                                                                                                               |
|----------------------|---------------------------------------------------------------------------------------------------------------|
|                      | boy and stuff like that and I let it go. He said, yeah, that's my work.                                        |
| **Attorney Pepper:** | … He said in referring to the article about the killing, the murder, he said, that's my work?                 |
| **Martin:**          | Yeah. He was like, that's my work. My mans did it.                                                             |
| **Attorney Pepper:** | He said, that's my work; my man did it?                                                                        |
| **Martin:**          | Yeah.                                                                                                          |

N.T., 1/13/17, at pp. 90-91.

Finally, Detective Snyder testified that his investigation revealed that there were at least two shooters. Scientific analysis of the shell casings that were found on the porch of the scene and the live round that was next to it came from one weapon. N.T., 1/11/17, at pp. 5, 39. The analysis further revealed that the bulk of the shell casings at the scene, which were found near the body of Holton, came from a separate firearm. *Id.* Detective Snyder explained as follows:

> All the shell casings under the tent came back to the same weapon. The live round that was found on the scene was compared to the shell casings that was [sic] found on the porch next to it. They came back to a second weapon. The way they determine this is every time a firing pin hits the back, it makes a certain impression. They examine this under a microscope. They can compare striations to each other and do that match. That's how they're able to determine that. All the shell casings that were under that tent area, one firearm. Live round and shell casing on the porch was from a second firearm even though same caliber and make and model of ammunition, they were determined to be two separate weapons.

*Id.* at p. 39. Detective Snyder opined that there were not only two separate firearms used, but that there were also two separate shooters. He reached this conclusion based on the significant distance between the location of where the bulk of the shell casings were found and the location of where the other casings and live round were found. *Id.* at p. 40.

The evidence presented at trial shows that Appellant was the member of the conspiracy who devised the murderous plot and ordered Robinson, his co-conspirator, to carry out the plot. In accordance with these orders, Robinson went to the home of Janine Edwards, where the murder

occurred, which was where they expected the victim to be at that time, and murdered the victim by shooting him at least five times. *See* N.T., 1/12/17, at pp. 128-129. As stated above, whether or not Appellant was actually one of the shooters is of no consequence if he conspired with Robinson or acted as Robinson's accomplice in carrying out the murder. The evidence presented at trial was sufficient to establish beyond a reasonable doubt that Appellant, in a conspiratorial fashion, acted with malice aforethought and with a specific intent to kill. *See Com. v. Boyle*, 470 Pa. 343, 368 A.2d 661 (1977) (evidence that defendant was member of conspiracy to kill three persons was sufficient to support guilty verdict against defendant in prosecution of three counts of first degree murder).

3. **"Whether the Trial Court erred in granting the Commonwealth's Motion in Limine to present evidence of Patrick Hughes' drug dealing and prior drug arrests under Pa.R.P.E. [sic] 404(B) by Order and Opinion on November 14, 2016?";**

This Statement of Error misconstrues the contents of this Court's Order of November 14, 2016. In our Order of November 14, 2016, we stated, in pertinent part, the following:

> The Commonwealth is permitted to introduce evidence regarding the prior drug deal that occurred on November 23, 2012, including any related photographs and testimony.

> The Commonwealth is precluded from introducing evidence regarding Hughes' prior drug arrest that occurred on February 24, 2011. However, any letters Hughes' sent to Nicole Green may be admitted in a matter consistent with the attached Opinion. Specifically, the letters must be appropriately redacted such that no reference is made to the aforementioned drug arrest or resulting incarceration.

Therefore, pursuant to the Order, we did not allow the Commonwealth to introduce evidence of Appellant's drug dealing in general; rather, we allowed evidence of a singular "prior bad act" of the drug deal that took place on November 23, 2012. As stated above, the reasons for our allowance of the introduction of this evidence can be found in the detailed Opinion that accompanied our Order of November 14, 2016.

Importantly, we *precluded* the Commonwealth from introducing evidence regarding

Appellant's drug arrest that occurred on February 24, 2011. Indeed, we stated in our Opinion in

support of the Order of November 14, 2016 the following:

> Even if the evidence of this prior drug arrest was relevant for the purposes claimed by the Commonwealth, we do not find that the Commonwealth has shown a sufficient connection between the drug arrest of February 24, 2011 and the homicide that occurred on November 23, 2012 such that such relevance would outweigh the potential for prejudice. We find that admitting evidence of another drug offense on the part of Hughes, which offense occurred over one year and nine months prior to the date of the homicide, would have a greater tendency to show Hughes' propensity for committing crimes and would divert the jury's attention away from its duty of weighing the evidence impartially.

*See* Opinion dated 11/14/16 at pp. 8-9. By way of our Order of November 14, 2016, we did not

permit evidence of any other prior drug arrest of Appellant to be introduce at trial.

4. **"Whether the Trial Court erred in admitting 911 tapes referencing a Honda Odyssey without affording the Defendant his right to cross-examination guaranteed and [sic] by the Confrontation Clause of the United States Constitution? *Crawford v. Washington*, 541 U.S. 36 (2004) and its progeny"** [sic]

In this Statement of Error, Appellant objects to the playing of one 911 tape to the jury in

which Christine Sandt reported her observations with regard to the November 23, 2014 shooting.

This 911 tape reflects a brief conversation between Ms. Sandt and the 911 operator in which Ms.

Sandt reports that there were shots fired, that she observed men running off toward a dark

colored van that was located by the Solo Mio Restaurant[5], and that the police could catch them if

they could get there quickly. N.T., 1/12/17, at pp. 73-75; *see also* Com. Exhibit 12.

Additionally, Ms. Sandt's husband (hereinafter, "Mr. Sandt") is heard in the background of the

911 tape indicating to Ms. Sandt that the minivan toward which the suspects were running was a

Honda Odyssey. *See* Com. Exhibit 12. Ms. Sandt then relayed this information to the 911

---

[5] We heard testimony from Detective Darren Snyder, that the Sole Mio Restaurant is less than half a block from the crime scene. N.T., 1/11/17, at p. 5.

operator. *Id.* Appellant argues that the introduction of this 911 tape violated his right to confront Mr. Sandt because Mr. Sandt was unavailable to testify as to his knowledge regarding the make and model of the minivan and because Ms. Sandt was not able to personally identify the minivan as a Honda Odyssey at the time she placed the 911 call.

Initially, we point out that, via the discovery process, defense counsel had proper notice of this 911 tape and its contents well before the start of trial. Further, Mr. Sandt was not named on the Commonwealth's list of witnesses it intended to call at trial, which list was provided to defense counsel prior to trial. N.T., 1/12/17, at pp. 92-93, 97-98, 103. Rather than presenting this Court with an appropriate Motion in Limine on this issue of Mr. Sandt's availability as a trial witness, counsel for Appellant waited until right before Ms. Sandt was about to testify during the trial to present this issue to the Court.

Nevertheless, it was not error for the jury to hear the contents of the 911 tape because the statements therein were nontestimonial. With respect to the Confrontation Clause, the Sixth Amendment of the United States Constitution provides: "[i]n all criminal proceedings the accused shall enjoy the right ... to be confronted with the witnesses against him." The United States Supreme Court found that this Clause is applicable where the statement elicited is "testimonial." In *Crawford v Washington*, the Supreme Court held that testimonial statements by declarants who do not appear at trial may not be admitted unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004). Here, however, the Confrontation Clause is not implicated because the statements at issue in the 911 tape are nontestimonial.

13

In *Davis v. Washington*, where the statements at issue were from a victim describing an ongoing domestic disturbance to a 911 operator, the Supreme Court defined what constitutes "testimonial" and "nontestimonial" statements as follows:

> [S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 813–14, 126 S. Ct. 2266, 2268–69, 165 L. Ed. 2d 224 (2006). The Court further stated, "A 911 call ... and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827 (internal citations and punctuation omitted).

Further, in *Michigan v. Bryant*, the Supreme Court found that a statement made to law enforcement for the primary purpose of responding to an ongoing emergency is nontestimonial and not within the scope of the Confrontation Clause. *Michigan v. Bryant*, 562 U.S. 344, 370, 131 S. Ct. 1143, 1162, 179 L. Ed. 2d 93 (2011). The *Bryant* Court stated, "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 370–71.

Instantly, because the 911 call at issue was made for the primary purpose of responding to an ongoing emergency, it consists of nontestimonial evidence which falls outside of the Confrontation Clause and need only satisfy the Evidence Rules for admissibility. *See Com. v. Williams*, 103 A.3d 354 (Pa. Super. 2014). In *Commonwealth v. Hood*, 872 A.2d 175 (Pa. Super. 2005), the Pennsylvania Superior Court found that a statement in a 911 call can be either an

14

excited utterance or present sense impression if the surrounding circumstances indicate that the caller actually witnessed what they described in the call. *Id.* at 184.

In the instant matter, Ms. Sandt's statements consisted of excited utterances as she described, in a hurried manner, that she had just heard shots fired in the City of Easton. This call was made to the 911 dispatcher as Mr. and Ms. Sandt were observing the event transpire at around 5:45 p.m. on the evening in question. Ms. Sandt indicated in the call that she observed two men run off toward a minivan and asked for the dispatcher to quickly send police so that the suspects could be apprehended. Therefore, it is clear that all of the descriptive statements made in this call, including the description of the minivan as a Honda Odyssey, were made during an ongoing emergency and to prevent any further danger to the public.

Evidence adduced at Appellant's trial contained sufficient "other corroborating evidence" to justify the admission of the 911 tape at issue. *Hood* at 184.[6] This other evidence that corroborates Ms. Sandt's statement that the minivan she observed was a dark colored Honda Odyssey includes the video recovered from the Sole Mio Restaurant that depicts two males running toward a dark colored minivan, as well as other witnesses who testified that they observed suspects running from the scene toward the Sole Mio Restaurant.

As such, the testimony of neither Ms. Sandt nor Mr. Sandt was required with respect to this call as the statements made in the 911 call are nontestimonial statements not subject to the Confrontation Clause and do not constitute inadmissible hearsay. Further, they were corroborated by other evidence adduced at trial. Therefore, this Court did not commit an error when it allowed the introduction of the statements made in the 911 call.

---

[6] Pursuant to the Rules of Evidence, statements made in 911 calls are admissible hearsay as either excited utterances or present sense impressions, as long as there is corroborating evidence presented to indicate that the person who called actually witnessed what they describe in the call. *Id.*

5. **"Whether this Honorable Court erred when it barred the Defense from cross-examining James Martin on his status as a sex offender registrant? See generally Pa.R.E. 607; _Commonwealth v. Cox_, A.2d 923 (Pa. 1999); _Commonwealth v. Murphy_, 591 A.2d 278 (Pa. 1991); _Commonwealth v. Harris_, 852 A.2d 1168 (Pa. 2004)"**

It was not error to preclude testimony regarding Mr. Martin's status as a sex offender registrant. There were no facts elicited during the direct examination of Mr. Martin that would have opened the door for this testimony.

To the extent Appellant argues that Mr. Martin's status as a sex offender registrant is admissible because it is equivalent to having a parole or probationary status, this argument is meritless. While defense counsel presented us with case law which stood for the general proposition that evidence that a witness is on parole and/or probation is admissible because it demonstrates that the witness had a motive to testify favorably for the Commonwealth, counsel had no case law which indicated that a status as a sex offender registrant was equivalent to that of being on probation.

Moreover, to the extent Appellant is arguing that Mr. Martin had a motive to provide favorable testimony for the Commonwealth due to any potential violations he may have had with respect to his ongoing reporting requirements pursuant to Megan's Law, this Court agreed with defense counsel at the time of trial that they should be permitted to cross-examine Mr. Martin regarding bias and why he might have cooperated with the Commonwealth. _Id._ at p. 160. We permitted defense counsel to cross-examine Mr. Martin on the charges he believed he was facing in terms of jail time at the time he cooperated with the Commonwealth, the minimum and maximum sentences possible for those crimes, as well as the ultimate sentence that he received.

16

*Id.* at pp. 155-156, 160, 166-169. What we did not permit, however, was for Appellant's counsel to inappropriately question Mr. Martin about his status as a sex offender registrant, which would have been entirely irrelevant.

Mr. Martin testified at trial that he had no reason to provide favorable testimony for the Commonwealth and that he was not offered anything for this testimony. Specifically, Mr. Martin explained during his testimony that the reason he initially spoke to the police was because he realized that he was being implicated for criminal actions in an entirely different case. *Id.* at pp. 138-142; 145-147. When Mr. Martin spoke to the police in order to clear his name in that particular case, that is when the detectives were notified that he was Appellant's cellmate and began to question Mr. Martin regarding the instant case. *Id.* Mr. Martin testified that he did not cooperate with the Commonwealth in exchange for any benefit because he, "[d]idn't really have nothing to fight for. By the time [he] got to court, [he] was going to get time served anyway." *Id.* at p. 137. *See also id.* at p. 170. Mr. Martin reiterated several times during his testimony that the District Attorney's office did not offer anything in exchange for his testimony in this case:

| **Attorney Pepper:** | District Attorney's office offer you anything? |
|---|---|
| **Mr. Martin:** | Never |
| **Attorney Pepper:** | So much as buy you a cup of coffee? |
| **Mr. Martin:** | Never. |
| … | |
| **Attorney Pepper:** | Offer you anything? |
| **Mr. Martin:** | (Shakes head.) |
| **Attorney Pepper:** | Did you get anybody from law enforcement about coming forward in this case? [sic] |

17

| | |
|---|---|
| **Mr. Martin:** | No. |
| **Attorney Pepper:** | Not even a cup of coffee? |
| **Mr. Martin:** | No. And the Ree Figueroa case that was basically to cover my ass because somebody got on the jail phone and implicate me in a capital case. |

*Id.* at p. 147; *see also id.* at p. 143. Appellant's counsel was given sufficient opportunity to cross-examine Mr. Martin with respect to any potential motivation he may have had for testifying favorably for the Commonwealth. *See id.* at pp. 135-137, 141-143.

Thus, it was not error on the part of this Court to deny defense counsel's request to elicit evidence regarding Mr. Martin's status as a sex offender registrant which testimony would have been irrelevant and unduly prejudicial. Accordingly, this issue is meritless.

6. **"Whether this Honorable Court erred when it failed to grant Defendant's request for a mistrial due to Nicole Green's [sic] testimony that Defendant was incarcerated during most of the time they dated? [N.T., 1/13/17, Page 207-208.]"**

The basis for Appellant's motion for a mistrial was a statement made by Nicole Greene, Appellant's ex-girlfriend, which referenced Appellant's incarceration. The following exchange between Ms. Greene and counsel for the Commonwealth contains the objected to statement:

| | |
|---|---|
| **Attorney Pepper:** | When were you dating, how would you characterize the relationship that you had with Mr. Hughes? |
| **Ms. Greene:** | Off and on. |
| **Attorney Pepper:** | Was it an intense relationship? |
| **Ms. Greene:** | *He was in jail most of the time that we were together.* |

N.T., 1/13/17, at p. 207. Immediately following this exchange, defense counsel made an objection on the record, and discussion occurred in the undersigned's robing room.

18

The remedy of a mistrial is within the sound discretion of the trial court, and a court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair, impartial trial. *Com. v. Messersmith*, 860 A.2d 1078, 1092 (Pa. Super. 2004). When dealing with a motion for mistrial due to a reference to past criminal behavior, the nature of the reference and whether the Commonwealth intentionally elicited the remark are considerations relevant to the determination of whether a mistrial is required. *Com. v. Kerrigan*, 920 A.2d 190, 199 (Pa. Super. 2007). Mere passing references to a defendant's prior criminal activity do not warrant reversal, unless the record illustrates that prejudice resulted from the references. *Com. v. Valerio*, 712 A.2d 301, 303 (Pa. Super. 1998).

Primarily, we point out that the statement that Appellant "was in jail most of the time that we were together" was a single reference to the fact that Appellant was incarcerated. Ms. Greene did not specifically state when Appellant was incarcerated, the nature of his incarceration, or the charges for which he was incarcerated. Indeed, any further reference to Appellant's incarceration was terminated upon defense counsel's immediate objection. At most, the jury in this case could have inferred that Appellant was incarcerated at some point in his past for an unknown crime. *See Kerrigan*, 920 A.2d at 200. Ms. Greene's singular, passing reference to a prior conviction/incarceration is simply not sufficient to show that we abused our discretion in denying Appellant's motion for a mistrial. *See, e.g., Kerrigan, supra. See also, Com. v. Guilford,* 861 A.2d 365 (finding no trial court error in denying a mistrial where there were two passing references to the defendant's prior convictions).

Further, it is clear that the Commonwealth did not intentionally elicit the information from the witness in this case. First, Ms. Greene's remark that Appellant was in jail for most of the time that they were together was not directly responsive to the Commonwealth's question of

19

whether they had an intense relationship. Also, during sidebar following Appellant's objection, the Commonwealth unequivocally stated several times on the record that the subject remark regarding Appellant's jail time was something Ms. Greene blurted out after being advised and warned about. N.T., 1/13/17, at pp. 209, 210. In fact, the Commonwealth asked the Court for permission to again caution Ms. Greene to refrain from making any additional reference to Appellant being incarcerated or to Appellant's prior convictions before she retook the witness stand. *Id.* at pp. 213, 216.

Although Ms. Greene's passing remark regarding Appellant's jail time, was not so prejudicial as to warrant a mistrial, we nevertheless gave the following cautionary instruction to the jury:

> Members of the jury, you heard reference from the witness to Mr. Hughes being in jail. You should not consider this information for any purpose other than only in terms of the historical background of the relationship and for no other reason. You may not consider any prior incarceration of Mr. Hughes as relevant to your determination of his guilt or innocence in this case.

*Id.* at pp. 216-217.

Here, it is evident that Ms. Greene's reference was not intentional and the nature of her comment was innocuous; therefore, our prompt curative instruction effectively remedied any negative influence the reference would have potentially had on the jury. Thus, our denial of Appellant's request for a mistrial did not constitute an abuse of discretion, and this issue is without merit.

7. "Whether the verdict was against the weight of the evidence."

The weight of the evidence presented at trial was sufficient to support a verdict of guilty of criminal homicide as murder of the first degree and criminal conspiracy to commit murder of

20

the first degree. In evaluating a challenge to the weight of the evidence, the standard has been

set forth in *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403 (2003):

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, (an appellate court) may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Champney* at 443, 832 A.2d at 408 (internal citations, quotations, and punctuation omitted). "A

true weight of the evidence challenge concedes that sufficient evidence exists to sustain the

verdict but questions which evidence is to be believed." *Com. v. Galindes*, 786 A.2d 1004, 1013

(Pa. Super. 2001). It is also important to point out that "[i]n criminal proceedings, the credibility

of witnesses and weight of evidence are determinations that lie solely with the trier of fact,

[which] is free to believe all, part, or none of the evidence." *Com. v. Lewis*, 911 A.2d 558, 566

(Pa. Super. 2006).

In this case, credible testimony which did not weigh in Appellant's favor, was provided

by several witnesses. Along with this testamentary evidence, cell phone records placing

Appellant and Robinson together near the crime scene on the date of the homicide, letters in

which Appellant professed his love to Nicole Greene, surveillance videos depicting Appellant

making a drug transaction on the date of the homicide and then going to a house with a Honda

Odyssey parked outside of it, and the video of Appellant's interview with Detective Snyder, were

entered into evidence.[7] Accordingly, given the credible testimony and other evidence presented

---

[7] See above for a more detailed discussion regarding the sufficiency of the evidence presented at trial, which we incorporate by reference.

21

at trial, the verdict rendered was not so "contrary to the evidence as to shock one's sense of justice," and therefore, was not against the weight of the evidence. *Champney, supra.*

8. **"Whether the Trial Court erred over Defendant's objection in denying Defendant's Motion for Severance, failing to order separate Trials, and determining that your Defendant would not be prejudiced by being tried with his Co-Defendant, Omar Robinson: See Pa.R.Crim.P. Rule 583"**

The reasons for our denial of the motion to sever the trial can be found in this Court's detailed Opinion addressing the Omnibus Pretrial Motions of Appellant and Robinson. This Opinion and accompanying Order were issued and filed on August 15, 2016.[8]

9. **"Whether the Trial Court erred in failing to grant Defendant's Motion for Change of Venue/Venire where the pretrial publicity was sustained, pervasive, inflammatory, and inculpatory and there was a presumption of prejudice in selecting a fair and impartial jury from Northampton County? See *Commonwealth v. Bridges*, 757 A.2d 859, 871 (Pa.Super. 2000)"**

The reasons for our denial of Appellant's motion to for a change of venue indicated in this statement of error can be found in this Court's detailed Opinion addressing the Omnibus Pretrial Motions of Appellant and Robinson dated August 15, 2016.[9]

Additionally, while we denied Appellant's motion for a change of venue in our Opinion of August 15, 2016, we did so without prejudice to Appellant's right to renew his request based upon the responses of the venire during jury selection. An extensive voir dire process took place at the outset of Appellant's trial during which counsel for Appellant asked the following question: "…this particular case on west St. Joseph Street on the south side of Easton in November 2012 received considerable publicity in the Express Times and The Morning Call and also in the local TV outlets. Anyone read about this case or see anything on TV about this

---

[8] We discuss our reasoning for denying the motion to sever the trial at pages 17-21 of the Opinion.

[9] We discuss our reasoning for denying Appellant's motion for change of venue at pages 14-17 of the Opinion.

22

case?" N.T., 1/9/17, at p. 105. In response, four members of the jury panel indicated that they remembered seeing and/or hearing about this case in the media. *Id.* at pp. 105-107. All four of these individuals indicated that the fact that they encountered this case in the media would not affect their ability to be fair and impartial jurors in the case. *Id.* Also, counsel for Appellant did not renew the request for a change of venue. Therefore, this issue is without merit.

**10. "Whether the Trial Court erred in failing to grant Defendant, Hughes', motion to suppress statements made to police on December 5, 2012 and December 4, 2014?"**

The reasons for our denial of Appellant's motion to suppress statements indicated in this statement of error can be found in this Court's detailed Opinion addressing the Omnibus Pretrial Motions of Appellant and Robinson dated August 15, 2016. [10]

**11. "Whether the sentence of the Court to a mandatory life sentence without the possibility of parole for first degree murder is unlawful where the underlying statute is unconstitutional and the sentencing issue was not presented to the jury? *Alleyne v. United States*, 133 S.Ct. 2151 (2013); 18 Pa. C.S.A. §1102, 42 Pa.C.S.A. §9711"**

**12. "Whether the mandatory sentence of Defendant to life imprisonment without the possibility of parole for Murder of the First Degree violates the Eighth Amendment Prohibition on cruel and unusual punishment?"**

At Appellant's sentencing, this Court imposed a mandatory term of life in prison for the first-degree murder conviction, which rendered Appellant ineligible for parole.[11] *See* 61 Pa.C.S. § 6137(a)(1)[12].

---

[10] We discuss our reasoning for denying Appellant's motion to suppress statements made to police on December 5, 2012 and December 4, 2014 at pages 21-29 of the Opinion.

[11] We also ordered Appellant to serve a concurrent term of twenty to forty years' imprisonment for the conviction of criminal conspiracy to commit criminal homicide as murder in the first degree.

[12] 61 Pa.C.S. § 6137 provides in relevant part:

(a) General criteria for parole.--
(1) The board may parole subject to consideration of guidelines established under 42 Pa.C.S. § 2154.5 (relating to adoption of guidelines for parole) and may release on parole any inmate to whom the power to parole is granted to the board by this chapter, *except an inmate condemned to death or serving life imprisonment*, whenever in its opinion:

23

We imposed this sentence pursuant to 18 Pa.C.S.A. § 1102, which states:

(a) First degree.--
(1) Except as provided under section 1102.1 (relating to sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement officer), *a person who has been convicted of a murder of the first degree* or of murder of a law enforcement officer of the first degree *shall be sentenced to death or to a term of life imprisonment* in accordance with 42 Pa. C. S. § 9711 (relating to sentencing procedure for murder of the first degree).

18 Pa.C.S.A. § 1102(a) (emphasis added).

The Pennsylvania Superior Court has previously addressed the constitutionality of mandatory life sentences for the crime of first-degree murder. In *Commonwealth v. Waters*, the Superior Court stated:

A mandatory life sentence, as established by the legislature, is clearly not cruel and unusual punishment for the crime of first-degree murder. Indeed, this issue has already been decided in *Commonwealth v. Sourbeer*, [422 A.2d 116, 123 (Pa. 1980)], in which the Supreme Court stated that a mandatory life sentence:
> is not cruel and unusual punishment for it is not an excessive and unnecessary punishment disproportionate to the crime and does not shock the moral conscience of the community.

*Com. v. Waters*, 483 A.2d 855, 861 (Pa. Super. 1984).

In the case *sub judice*, Appellant was convicted of committing first degree murder as an adult and was sentenced pursuant to the mandatory sentence provision established by the legislature at 18 Pa.C.S.A. § 1102.[13] Our current jurisprudence holds that mandatory life

---

(i) The best interests of the inmate justify or require that the inmate be paroled.
(ii) It does not appear that the interests of the Commonwealth will be injured by the inmate's parole.

61 Pa.C.S. § 6137(a)(1) (emphasis added).

[13] While the United States Supreme Court has held unconstitutional the application of mandatory life sentences without the possibility of parole to individuals under the age of eighteen at the time they committed the crime for which they received the life sentence, we need not consider this application as there is no dispute that Appellant was over the age of eighteen at the time he committed murder in the first degree. *See Miller v. Alabama*, 132 S. Ct. 2455 (2012).

sentences without the possibility of parole for individuals over the age of eighteen convicted of first degree murder do not violate the United States or Pennsylvania constitutional prohibitions against cruel and unusual punishment. *See Waters*, 483 A.2d at 861; *see also Miller v. Alabama*, 132 S. Ct. 2455 (2012).

Given the foregoing, it is clear that this Court lacked any legal authority to impose a sentence less severe than that mandated by the legislature. These statements of error are without merit.

13. **"Whether the Court erred in denying Defendant's request to instruct the Jury that in Pennsylvania the mandatory sentence for first degree murder is life imprisonment without the possibility of parole."**

The role of the jury is to determine guilt or innocence. According to the Pennsylvania Supreme Court, "the jury has nothing to do with the punishment of an offense, ... [i]n all other instances, punishment is a matter solely for the court and not for the jury to know or consider during its deliberations." *Com. v. White*, 504 A.2d 930, 930 (Pa. Super. 1986) (citing *Com. v. Lucier*, 424 Pa. 47, 49, 225 A.2d 890, 891 (1967)).[14] *See also Com. v. Waters*, 483 A.2d 855, 860 (Pa. Super. 1984) (trial court was correct in prohibiting defense counsel from discussing the penalties of the offense in his closing arguments).

Here, this Court clearly and accurately instructed the jury that the verdict should be based on evidence and not on what the penalty might be in the event of a conviction. We instructed as follows:

> In arriving at a verdict, you should not concern yourselves with any possible future consequences of your verdict, including what the penalty might be if you should find the defendants guilty. The question of guilt and the question of penalty are decided separately.

---

[14] In *White*, the appellate court found that the trial court was correct in refusing to instruct the jury that a mandatory sentence would be imposed if appellant were found guilty.

25

N.T., 1/19/17, at p. 143. This instruction properly informed the jurors as to their appropriate function of determining the facts of the case. No error was committed in denying Appellant's improper request to instruct the jury regarding the mandatory sentence of first degree murder.

## IV. Conclusion

In conclusion and as indicated above, this Court did not err as a matter of law and/or fact in the matter *sub judice*, and Appellant's appeal should be denied.

BY THE COURT,

JENNIFER R. SLETVOLD, JUDGE

DATE: 10/30/17

26



IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :
                                  :
v.                                :          No.   CR-1347-2015
                                  :          No.   CR-1892-2015
OMAR ROBINSON;                    :
PATRICK T. HUGHES,                :
            Defendants.           :

Appearances:  Brian M. Monahan, Esquire, for Defendant Patrick T. Hughes
              Liam J. Riley, Esquire, for Defendant Omar Robinson
              Assistant District Attorney William Blake, Esquire, for the Commonwealth.

## OPINION

This matter comes before the Court on the Omnibus Pretrial Motions of Defendant Omar Robinson (hereinafter, "Robinson") and Defendant Patrick T. Hughes (hereinafter, "Hughes") (collectively, "Defendants"). For the reasons that follow, with the exception of Hughes' motion to suppress statements made by him on December 11, 2012 only, all other of Defendants' Motions are DENIED.[1]

Robinson is charged with Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501, for intentionally, knowingly, recklessly or negligently causing the shooting death of Ervin Holton on November 23, 2012. Hughes is charged with Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501, for soliciting Robinson to commit the offense of the aforementioned criminal homicide and/or aiding, agreeing, or attempting to aid Robinson in planning or committing same. Both Defendants are also charged with Criminal Conspiracy to Commit Criminal Homicide, in violation of

---

[1] Hughes's motion for change of venue, more specifically described below, will be denied without prejudice to his right to renew that request if the jury selection process indicates that an impartial jury cannot be selected because the members of the venire are unable to set aside any opinions that they formed based upon the pre-trial media reports and to decide the consolidated cases objectively based upon the evidence presented.

1

18 Pa.C.S.A. § 903 A1, for conspiring with the other to cause the death of Ervin Holton. On December 4, 2014, Robinson and Hughes were arrested in connection with the death of Ervin Holton.

## Robinson's Motions

Robinson seeks three[2] forms of relief. First, he first seeks to sever his joint trial from the co-defendant Hughes, arguing that he will be prejudiced by a single trial due to the prospect of Hughes offering incriminating statements at trial. Second, Robinson seeks to suppress evidence seized from a 2007 Honda Odyssey minivan (hereinafter, "the minivan") on the following grounds: that he had a reasonable expectation of privacy in the minivan; that he withheld his consent for the police to search the minivan; that the police did not have probable cause or reasonable suspicion that the minivan contained evidence of a crime prior to conducting the search; and that any items discovered pursuant to the subsequent execution of the search warrant obtained are products of the initial unconstitutional search of the minivan. Third, Robinson filed a Habeas Corpus Motion to Dismiss the Information filed against him.

## Hughes' Motions

Hughes seeks several forms of relief. First, Hughes seeks to sever his joint trial from the co-defendant, Robinson. Second, citing to pre-trial publicity and media reports, Hughes requests a change in venue/venire. Third, Hughes seeks to suppress statements he allegedly made because he claims that he was not properly advised of his *Miranda* rights and that certain statements he made were obtained by unlawful actions of the police that resulted in coercion and the overbearing of his will. Fourth, Hughes petitions for a "writ of habeas corpus/motion to quash" on the grounds that the

---

[2] In Robinson's Omnibus Pretrial Motion, he originally sought an additional form of requested relief, that being a "Motion to Compel Additional Discovery." However, at the hearing on the omnibus pretrial motions, counsel for Robinson stated that this motion need not be addressed by the Court as all discovery had been received from the Commonwealth up to the current point in time. *See* Notes of Testimony (N.T.), 3/7/16, at p. 18. *See also Id.* at p. 10. Therefore, we need not address Robinson's Motion to Compel Additional Discovery herein.

2

Commonwealth failed to make a *prima facie* case and that his right to be free from unreasonable seizures of his person was violated. Specifically, he argues that although a preliminary hearing was held, no transcript of that hearing exists. Finally, at the hearing on the instant omnibus pretrial motions, Hughes joined Robinson's motion to suppress evidence seized from the minivan.[3][4]

On March 7, 2016, Defendants and all counsel appeared before the undersigned for a hearing on Defendants' Omnibus Pretrial Motions. The Court heard testimony from Detectives Matthew Rush, Christopher Miller, and Darren Snyder, all of whom are employed by the City of Easton Police Department; and Timothy Graves, who is currently an inmate in a State Correctional Facility. The Commonwealth supplemented the factual record with the transcript of Robinson's Preliminary Hearing, held on April 29, 2015, as well as the exhibits attached thereto. At Robinson's Preliminary Hearing, the following individuals gave testimony: Sergeant Richard Weber, employed by the City of Easton Bureau of Police; Zachary Lysek, employed by the County of Northampton as the coroner; and Detectives Rush, Miller, and Snyder.[5]

---

[3] In his Omnibus Pretrial Motion, Hughes also presents a "Motion to Compel," a "Motion for Disclosure of Exculpatory Evidence by the District Attorney," and a "Motion for Disclosure of Inventory of All Physical Evidence in the Possession of the Commonwealth." However, at the hearing on his Omnibus Pretrial Motion, counsel for Hughes indicated that all discovery had been received from the Commonwealth up to the current point in time. *See* N.T. at p. 10. Additionally, Hughes's counsel stated that his motion for exculpatory evidence was included within his discovery request which was moot. Therefore, we need not address these motions herein.

[4] We note that Hughes also presented a Motion "to Extend Time for Filing of Supplemental Omnibus Pretrial Motions". This Court addressed this request at the time of the hearing on the Omnibus Pretrial Motions. While we granted Hughes the additional time he requested, Hughes filed no additional motions.

[5] The exhibits admitted into evidence by the Commonwealth at Robinson's Preliminary Hearing consist of the following:

Commonwealth Exhibit 1A – Overhead satellite photograph of the neighborhood of the 100 Block of West St. Joseph Street, Easton, Pennsylvania;

Commonwealth Exhibit 1B – Daytime photograph of the residence at which officers responded to the incident in question, located at 147-145 West St. Joseph Street;

Commonwealth Exhibit 1C – Nighttime photograph of the 147-145 West St. Joseph Street residence, depicting fabric barricades set up by the criminal investigative division;

Commonwealth Exhibit 1D – Photograph of 147-145 West St. Joseph Street, taken on the evening in question,

3

On March 23, 2016, Hughes filed a Memorandum in Support of his Omnibus Pretrial Motions. In said Memorandum, the only issues that were briefed were Hughes' Motion for Change of Venue/Venire and Hughes' Motion to Suppress Search of the Van. Counsel for Defendant Robinson presented oral argument during the March 7, 2016 hearing; however, he did not file any additional written argument with respect to his Motions. The Commonwealth filed Answers to both Defendants' Motions, as well as a Memorandum in Opposition to Hughes' Motion. Trial in this matter is scheduled to commence on September 6, 2016.

---

depicting a tan-colored car in front of the residence, a blue canopy set up in order to preserve evidence from the rain, and evidence markers on the sidewalk;

Commonwealth Exhibit 1E – Photograph of 147-145 West St. Joseph Street, depicting crime scene tape in front of 145 West St. Joseph Street, a black sheet shielding a direct view of the residence at 147 West St. Joseph Street, and evidence markers;

Commonwealth Exhibit 1F – Photograph of the porch of 147 West St. Joseph Street, depicting a deceased male in the threshold of the doorway;

Commonwealth Exhibit 1G – Photograph of the body of Ervin Holton as identified by Northampton County coroner, Zachary Lysek;

Commonwealth Exhibit 1 H-J – Photographs of Patrick Hughes, Omar Robinson, and Qawi Hutcheson, taken on November 23, 2012 on or around the 300 Block of North 7th Street near the intersection of Sassafras Street in Easton, Pennsylvania;

Commonwealth Exhibit 2 – Coroner's Investigative Report;

Commonwealth Exhibit 3 – Autopsy Report, prepared by Dr. Edward Chmara;

Commonwealth Exhibit 4 – Death Certificate of Ervin Holton;

Commonwealth Exhibit 5 – Video footage from November 23, 2012, which was obtained from Tommy's Sole Mio Restaurant in Easton, Pennsylvania;

Commonwealth Exhibit 6 – Lab report from the Pennsylvania State Police Bureau of Forensic Sciences regarding shell casings and a live round obtained from the scene of the homicide;

Commonwealth Exhibit 7 – Report from RJ Lee Group regarding samples collected from inside of the minivan.

4

## I.   Factual Background

On November 23, 2012, the day after Thanksgiving, commonly referred to as "Black Friday"[6], Sergeant Weber and Detectives Rush, Snyder, and Miller responded to the scene of a shooting at 145-147 West St. Joseph Street, Easton, Northampton County, Pennsylvania (the south side of Easton), where they found a deceased male with multiple gunshot wound injuries. N.T., 4/29/15, at pp. 7-14, 37, 57, 94, 112-113. These officers responded to the scene as a result of an initial call to the 911 dispatch center which was placed earlier that day at approximately 5:41 p.m. *Id. See also id.* at p. 52.

Coroner Zachary Lysek, who also reported to the scene, identified the victim as Mr. Ervin Holton (hereinafter, "Holton"), and ruled that the manner of death was a homicide as a result of multiple gunshot wounds. *Id.* at pp. 38, 39, 40, 48-50. Upon the officers' arrival at the scene, they observed Holton's lifeless body in the threshold of the doorway of 147 West St. Joseph Street in a slouched position between the screen door and the main door. *Id.* at pp. 13, 21, 57, 113. They also observed multiple shell casings on the surrounding street and sidewalk area. *Id.* at pp. 16-18, 113-116. Detective Snyder found a live round on the steps leading up to the residence. *Id.* Photographs were taken at the scene, depicting these observations.

While at the scene of the shooting, Sergeant Weber and two other officers went inside of the residence at 147 West St. Joseph Street where they encountered two females. *Id.* at pp. 13, 25, 28, 84-85. One of the females reported to Sergeant Weber that she heard gunshots and pounding on the door. *Id.* at p. 27. Detective Rush testified that he also had the opportunity to speak with Janine Edwards, one of the women who resided at the address. *Id.* at pp. 57-58. *See also id.* at p. 125. Ms. Edwards identified herself as Holton's friend, and she informed Detective Rush that Holton had been coming to her residence in order to borrow her vehicle because his vehicle was experiencing

---

[6] This was also the evening of the "Christmas Candle Lighting," a ceremonial lighting of a structure resembling a peace candle, which takes place in Easton's downtown Center Square. N.T., 4/29/16, at p. 12

5

mechanical problems and that he had called her briefly before she heard the gunshots. *Id.* at pp. 58, 84.

Approximately one or two days after the date in question, Detective Miller went to Tommy's Sole Mio Restaurant, which is approximately one block northwest from the crime scene, in order to obtain video surveillance from cameras that were placed outside of the restaurant. *Id.* at p. 95; *see also id.* at pp. 59-60, 70. Detective Rush, who also assisted in the collection of the video surveillance, provided testimony regarding the footage. The footage collected from Tommy's Sole Mio Restaurant is from November 23, 2012 between the times of roughly 5 p.m. and 7 p.m., however the relevant footage about which Detective Rush testified during Robinson's preliminary hearing is an eleven minute clip. *Id.* at pp. 66, 70, 81. The footage was taken from cameras that were placed at different locations of the restaurant so that different angles and directions were able to be viewed. *See Id.* at pp. 62-70. The camera that faced Madison Street in Easton showed a dark-colored minivan pulling west onto Madison Street and parking along the roadway at approximately 5:39 p.m. *Id.* at p. 67; *see also id.* at Com. Exhibit "5". The surveillance shows that the minivan was parked for a few moments when two individuals exited it and headed south through the restaurant's parking lot. *Id.* The camera that faced the alleyway to the left of the restaurant showed a closer view of the same two individuals walking through the parking lot until they walked out of sight of all cameras. *Id.* at p. 68; *see also id.* at Com. Exhibit "5". Approximately one minute and twenty seconds later, both cameras show the two individuals running from the direction that they had previously been going. *Id.* at pp. 69, 71; *see also id.* at Com. Exhibit "5". They are seen running back towards the minivan, getting into the minivan, and pulling away west onto Madison Street. *Id.*

Detective Rush testified that on November 24, 2012, an individual identified as Miss Sandt called him and reported that she had been in the area at the time of the shooting and that she observed two males running in front of her vehicle and through the Tommy's Sole Mio parking lot. *Id.* at pp. 72-73. She indicated that these males got into a dark-colored Honda Odyssey minivan and left the area,

6

driving west on Madison Street. *Id.* at p. 73. Based on this information, officers within the Easton Police Department determined that the minivan in question was registered to an individual named Barbara Doorley. *Id.* at pp. 73-74; *see also* N.T., 3/7/16, at p. 26. The officers obtained two addresses in connection with the minivan and Barbara Doorley. N.T., 3/7/16, at pp. 52, 70.

On November 28, 2012, Detective Miller went to 3040 Eldridge Avenue in Palmer Township, Northampton County, in an attempt to locate the minivan. *Id.* at pp. 60, 69-70; *see also* N.T., 4/29/15, at pp. 96-97. Detective Miller came into contact with Robinson, who resided at this address. *Id.* Robinson indicated that his girlfriend and her mother owned a minivan; however, neither of them were present at the residence at that time. N.T., 3/7/16, at pp 62; 72-73. Detective Miller testified that he advised Robinson that he was there in connection with a homicide investigation, at which point Robinson became upset and did not want to talk any further to Detective Miller. *Id.* at pp. 71-72. Robinson gave Detective Miller his phone number and said that maybe he would be willing to speak to him at a later time. *Id.* at pp. 72-74.

On that same date, Detective Rush spoke to Barbara Doorley's daughter, Lisa Doorley, (hereinafter, "Ms. Doorley") on the telephone. *Id.* at p. 52; N.T., 4/29/15 at p. 75. Lisa Doorley confirmed that she had access to a dark-colored Honda Odyssey and that she would arrive home at 3040 Eldridge Avenue in Palmer Township between 7:30 and 8:00 that night. N.T., 4/29/15, at p. 75.

Detectives Miller and Rush responded to the 3040 Eldridge Avenue residence that same night at approximately 7:30 p.m. *Id.* at pp. 74-75. They waited in their vehicle for several minutes until Ms. Doorley arrived in the dark-colored Honda Odyssey and pulled into the driveway. *Id.* at p. 75. According to the testimony of Detectives Miller and Rush, they then exited their vehicle, approached Ms. Doorley, identified themselves, and indicated that they would like to speak with her because they were investigating the minivan in connection with a homicide. *Id.* At some point soon thereafter, Detectives Miller and Rush entered the residence and encountered Robinson. *Id.; See also* N.T., 3/7/16, at pp. 29-32.

7

A conversation about the minivan ensued between Detective Rush, Ms. Doorley, and Robinson inside the residence. N.T., 3/7/16, at pp. 30-32. Ms. Doorley indicated that although the minivan was registered in her mother's name, she was the primary operator. N.T., 4/29/15, at pp. 79-80. However, Robinson informed Detective Rush that, on November 23, 2012 between the hours of 5 p.m. and 6 p.m., he was in possession of the minivan at a liquor store and a gas station. *Id.* at p. 81. When Detective Rush informed Robinson that he would be able to obtain video surveillance to verify what Robinson was telling him, Robinson asked the Detectives to step outside to continue the conversation, away from Ms. Doorley and their children. *Id.* at pp. 81-82.

Further conversation took place outside of the residence between Detective Rush and Robinson. *Id.* at p. 82. When Detective Rush informed Robinson that he had a video showing the minivan near the scene of the homicide, Robinson became emotional and started shaking his head and crying. *Id.* at p. 83. Detective Rush asked whether Robinson could have loaned the minivan out to someone else at the time of the incident, but Robinson told Detective Rush that no one other than himself or Lisa Doorley drove the minivan. *Id.* At some point while Detectives Rush and Miller were at the Eldridge Avenue residence for purposes of investigating the minivan, Robinson also had a conversation with Detective Miller[7] during which he again became upset, indicated that he did not wish to speak any further, and returned to the inside of the residence. N.T., 3/7/16, at p. 67.

While Detectives Miller and Rush were outside of the residence, they spoke to Ms. Doorley regarding her consent to search the minivan. *Id.* at pp. 64-65. Detective Rush testified that he asked for Ms. Doorley's consent as opposed to Robinson's consent because Ms. Doorley was the one who maintained the minivan financially and who operated it on a day-to-day basis. *Id.* at pp. 43-44. Both Detectives Rush and Miller testified that Robinson never told them that he did not want them to

---

[7] Detective Rush testified that this conversation took place after he spoke outside with Robinson, but before the minivan was searched. N.T., 3/7/16, at p. 32. Detective Miller testified that this conversation took place after the search of the minivan was concluded. N.T., 3/7/16, at p. 67.

search the minivan, and Robinson never exited the residence in an attempt to terminate the search. *Id.* at pp. 42-43, 77.

Detectives Rush and Miller testified that Ms. Doorley gave them permission to search the minivan by signing a written consent form, which signing they both witnessed; however, the form was misplaced sometime thereafter. *Id.* at p. 33-35. Detective Rush also testified that Ms. Doorley verbally consented to the search and provided them with the keys to the minivan. *Id.* at p. 33. Further, Detective Rush testified that he informed Ms. Doorley that she had the right to terminate the search at any time and that he stood next to Ms. Doorley while Detective Miller conducted the search in case Ms. Doorley wanted to terminate the search. *Id.* at pp. 35-36, 46.

During Detective Miller's search of the minivan, which took approximately ten minutes, he looked for the presence of a handgun, bullets, and casings. *Id.* at p. 41; N.T., 4/29/15, at p. 100. He also performed a gunshot residue test on the passenger's and driver's side exterior door handles, the passenger's and driver's side interior door handle[8], the gear shift, and the steering wheel. N.T., 4/29/15, at pp. 100-101. This test is performed by collecting microscopic particles onto a sticky surface of a tube and then capping and securing the tube, and bagging it as evidence. *Id.* at p. 100. Detective Miller testified that he later secured all six tubes in the Police Department's evidence room. *Id.*

Detective Snyder sent four of the six tubes to the RJ Lee lab group for gunshot residue testing. *Id.* at p. 120. Detective Snyder explained that he did not send out the two tubes from the exterior door handles because they were exposed to the outside elements. *Id.* at p. 122. The test results

---

[8] Detective Miller clarified that this is the handle that one would pull in order to close the door, not the handle one would pull to open the door from the inside.

9

revealed a positive presence for gunshot residue on the steering wheel and the driver's side interior door handle.[9] *Id.*

Detective Snyder was also responsible for collecting and sending out for testing the shell casings and live bullet[10] that were found at the scene of the shooting at 145 and 147 West St. Joseph Street in Easton. *Id.* at pp. 115-118. Detective Snyder testified as to the corresponding lab report results from the Pennsylvania State Police Bureau of Forensic Sciences. He indicated that the report concluded that two separate weapons were used in the incident with the bulk of rounds coming from one weapon. *Id.* at p. 119. The report also concluded that the live round was chambered, attempted to fire, but failed to discharge. *Id.*

Detective Snyder also testified that at an earlier time on the date of the shooting, a separate investigation of Robinson, Hughes, and an individual named Corey Reavis (hereinafter, "Reavis") was conducted by the vice department.[11] *Id.* at p. 133. Specifically, Detective Arrendondo, who led this investigation, conducted a controlled purchase of heroin at approximately 12:55 p.m. on November 23, 2012 wherein a confidential informant, called "Mike Miller," was sent to purchase heroin from Hughes at a location close to Reavis' residence on the 300 block of North 7th Street in Easton. *Id.* at pp. 133-134; N.T., 3/7/16, at p. 111-112. During the course of this controlled purchase operation, Detective Arrendondo photographed the drug transaction taking place as well as several males who were with Hughes at the time. (*See* Com. Exhibits "1 H-J"). Detective Arrendondo informed Detective Snyder that Robinson, Hughes, and an individual identified as Qawi Hutchinson

___

[9] Detective Snyder explained that he sent the samples to RJ Lee for testing as opposed to the State Police because the State Police only accept samples taken directly from the suspect, not from other objects or locations such as a vehicle. Further, Detective Snyder testified that RJ Lee is a private lab company which is well known in the law enforcement field for forensic testing and that the turnaround time to receive results from RJ Lee is faster than if the State Police had performed the test.

[10] Detective Snyder testified that when he reported to the scene, he observed a live round approximately three to four feet from Holton's body. Detective Snyder explained that a live bullet is a round that was not fired.

[11] Detective Snyder testified that Reavis stated during an interview with police that he was the individual who drove Holton to King Mart, which is near the residence at 147 West St. Joseph Street, around the time of the incident, in order to pick up a vehicle from Janine Edwards.

10

(hereinafter, "Hutchinson") could be seen in the photos near Reavis' residence and that they arrived at Reavis' residence together in a dark blue Honda Odyssey. N.T., 4/29/15, at p. 135. Detective Snyder testified that his investigation of the homicide further revealed that Robinson and Hughes were last seen together in the minivan at approximately 3:00 or 4:00 in the afternoon on November 23, 2012 prior to the homicide. N.T., 3/7/16, at p. 92.

As part of the continuing investigation, Detective Snyder also obtained court orders for cell phone records of Robinson, Hughes, and Reavis. Detective Snyder testified that these individuals, themselves, provided their phone numbers to the police. N.T., 4/29/15, at pp. 124-125. Subsequently, phone records of Robinson, Hughes, and Reavis were obtained for the days leading up to and after the homicide. *Id.* at p. 126. Detective Snyder testified that in the hour and twenty minutes leading up to the shooting, there were about forty answered and unanswered calls that took place between Robinson, Hughes, and Reavis. *Id.* at pp. 130-131. At the time that the shooting was reported to the police to have occurred, approximately 5:39 p.m., the calls between the three individuals stopped. *Id.* at pp. 126, 130. An additional nine calls took place in the forty-five minutes following the shooting. *Id.* at p. 131. The cell tower information revealed that the calls made to and from the three individuals during this time period were all transmitted from the cell tower located on the south side of Easton, indicating that the three individuals were in close proximity to this tower at the time the calls were placed. *Id.* at pp. 144, 146.

On December 5, 2012, Hughes was arrested as a result of the controlled purchase/vice investigation. N.T., 3/7/16, at pp. 93, 98. On that same day, Hughes was taken to the Easton Police Department for an interview with Detectives Snyder and Rush. *Id.* at pp. 98, 101. Prior to the interview, Hughes signed a "Rights and Waiver" form indicating that he understood his *Miranda* rights and that he was willing to waive these rights by answering questions without an attorney present. *Id.* at pp. 100-101. Hughes' execution of the form, as well as the entire interview, was audio/video recorded. *Id.* at p. 99. Detective Snyder testified that during this interview, he spoke to

11

Hughes about the vice investigation and about the shooting that occurred on that same day. *Id.* at p. 101.

Hughes initially indicated to Detective Snyder that on November 23, 2012, he was with his girlfriend, Shanice Mendola, for most of the day. *Id.* at p. 102-104. When Detective Snyder confronted him with his knowledge of photographs depicting Hughes' presence in Easton with Robinson, Reavis, and Hutchinson for an undercover drug deal, Hughes provided another alibi, indicating that at the time of the shooting, he was with his mother and had been making drug sales throughout the city of Easton. *Id.* at pp. 104-105. While Hughes did relay to Detective Snyder that he had passed Reavis around 5:00 p.m. near Reavis' residence, Hughes stated that he was selling heroin to individuals named Lala, Sequoia, and Dan. *Id.* at pp. 105-107. Thereafter, Detective Snyder spoke with Shanice Mendola, Lala, and Sequoia, and these individuals all provided differing accounts. *Id.* at pp. 107-108. Sequoia specifically stated she did not believe Hughes was at her residence on the date in question. *Id.* at p. 108.

On December 4, 2014, while Hughes had already been incarcerated on his drug-related charges, he was served with a warrant with respect to the instant homicide case. *Id.* at p. 108. Detective Snyder interviewed Hughes at which time Hughes executed another "Rights and Waiver" form wherein he waived his Miranda rights. *Id.* at pp. 108-109. During this interview, Hughes stated that he did not understand why he was arrested for a homicide when he was not present at the scene on that date. *Id.* at p. 111. The alibi he provided during this interview was that he was selling drugs to a confidential informant named "Mike" at the time of the homicide.[12] *Id.* at pp. 111-113. After providing this alibi, Hughes requested to return to his cell. *Id.* at p. 113.

The Commonwealth also provided testimony from Timothy Graves (hereinafter, "Graves"), an inmate incarcerated in a state correctional facility. Graves testified that he shared a prison transport

---

[12] Notably, the vice investigation revealed that Hughes sold drugs to a confidential informant, "Mike Miller," at around 12:55 p.m. on November 23, 2012, not at the time of the homicide.

12

with Hughes on April 25, 2015 as they were both riding to Northampton County to appear in court on unrelated matters. *Id.* at pp. 130-131. Graves testified that during this transport, Hughes discussed information relative to the case he had pending in Northampton County. Specifically, Graves testified that Hughes first informed him that he was being transported to Northampton County because he was caught possessing a cell phone in the prison. *Id.* at pp. 132-133. Hughes then proceeded to tell Graves that Hughes was also being investigated regarding a case involving a homicide in the City of Easton. *Id.* at pp. 132-133. According to Graves, Hughes indicated that he "needed to be very careful about what he said to who because he had a previous 'cellie' that turned around and apparently said everything that he told him about his crime." *Id.* at p. 134. Graves testified regarding the conversation with Hughes as follows:

> ...then he continued on to say that that's going – it couldn't be used against him because it's hearsay. And he started to talk about how he was – when he was incarcerated on a previous charge, I guess an ex-girlfriend got with another guy. He mentioned that he might have been a rival drug dealer in Easton. And that he felt disrespected by that. And warned the guy several times not to talk to the girl anymore. And then went on to say that when he didn't stop seeing the girl, his mans handled that were his exact words.

*Id.* Graves also testified that Hughes told him that he prepared an alibi for the time of the homicide because he was familiar with the City of Easton's police investigative tactics. *Id.* at p. 136.

Graves relayed the contents of this conversation to Detective Rush, who was one of Graves' prosecuting officers, and later sent a letter to Detective Rush that included information that Graves forgot to mention during his discussion with Detective Rush. *Id.* at pp. 136-137; 163-164 ; *see also* Exhibit admitted on 3/7/16 as "Exhibit 11." Graves testified that he was unaware at that time that Detective Rush was involved with the investigation of the instant homicide case. *Id.* at p. 164. Graves stated that he did not receive any promises for testifying about his conversation with Hughes and that he was not aware of any circumstances where he could be released prior to his minimum sentence. *Id.* at pp. 158-159. Rather, he indicated that his incentive for testifying in this matter was

13

"to do the right thing." *Id.* at p. 159. Notably, Graves is incarcerated as a result of a number of theft-related convictions, or *crimen falsi*.[13] *Id.* at p. 138.

## II.  Discussion

### A. Hughes' Motion for Change of Venue

Hughes requests a change of venue on the grounds that the pre-trial publicity regarding the homicide in question and Hughes' arrest and official presentation of the charges in this case have been "sustained, pervasive, inflammatory, inculpatory, and there is a presumption of prejudice in selecting a fair and impartial jury from Northampton County." Counsel for Hughes was given an opportunity to be heard on his Motion for a Change of Venue at the omnibus pretrial hearing that took place on March 7, 2016. Counsel stated that he would address the Motion for Change of Venue by submitting newspaper articles to the Court on a later date. *See* N.T. at p. 11. In his Memorandum in Support of Omnibus Pretrial Motions, filed on March 23, 2016, Hughes provided the Court with argument regarding his Motion for Change in Venue as well as headlines and articles that appeared in local press, including the *Morning Call* newspaper, the *Express-Times* newspaper and the companion Lehighvalleylive.com news website. *See* Hughes' Memorandum in Support of Omnibus Pretrial Motions at pp. 2-5, Exhibits 1-35. Hughes argues that these publications "will create an aura of pervasive and inflammatory media publicity that will prevent (him) from receiving a fair trial." *Id.* at p. 5.

---

[13] Graves was initially arrested in Lehigh County for one count of burglary. *Id.* at p. 161. Later, four more counts of burglary were added in Northampton County. *Id.* Graves pled guilty to two counts of burglary in Northampton County. *Id.* His case in Lehigh County was also disposed of, and Graves received consecutive sentences. *Id.* Graves subsequently confessed to other incidents of burglary, and additional charges were added in both Northampton and Lehigh Counties. *Id.* at p. 162. Graves testified that he confessed to these incidents because he "wanted to do the right thing," but he later stated that in return for his cooperation in these cases, he was given a plea bargain so that he would receive "less on the front and more on the back" end of his sentence. *Id.* at pp. 152, 165-166. Graves was sentenced on those charges, originally receiving a sentence of six to fifteen years; however, after requesting to have his sentence modified, he received a sentence of two and a half to twenty years to run consecutive to all of the other sentences he received. *Id.* at p. 162.

14

A request for a change of venue is within the sound discretion of the trial court because "the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change." *Com. v. Briggs*, 608 Pa. 430, 466, 12 A.3d 291, 313 (2011) (quoting *Com. v. Tharp*, 574 Pa. 202, 219, 830 A.2d 519, 529 (2003)). Pursuant to Pennsylvania Rule of Criminal Procedure No. 584, a change in venue is mandated only where a fair and impartial trial cannot be otherwise had in the county where the case is currently pending. Pa. R. Crim. P. 584 (A). The moving party bears the burden of demonstrating the necessity of a change of venue and must show actual prejudice in the empanelling of the jury. *Com. v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086 (1998).

The mere existence of pretrial publicity does not justify a presumption of prejudice, nor does it warrant a change of venue. *Com. v. Birdsong*, 538 Pa. 587, 596, 650 A.2d 26, 31 (1994); *Com. v. Tharp*, 574 Pa. 202, 219, 830 A.2d 519, 529 (2003). Prejudice will only be presumed if the defendant proves that the pretrial publicity: 1) "was sensational, inflammatory, and slanted toward conviction, rather than factual and objective;" 2) "revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant;" or 3) was "derived from official police or prosecutorial reports." *Com. v. Chmiel*, 612 Pa. 333, 404, 30 A.3d 1111, 1152 (2011). Even if a defendant proves the existence of one or more of these circumstances, and the publicity is deemed to be inherently prejudicial, a change of venue is not warranted unless the defendant also shows that the pretrial publicity was "so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it." *Birdsong*, 611 Pa. at 224, 24 A.3d at 332.

The inquiry must turn on whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pretrial publicity. *Id.*

> Simply because prospective jurors may have heard about a case through media reports does not render them incapable of jury service, since, in today's "information age" where news of community events are disseminated virtually instantaneously by an ever multiplying array of

15

delivery methods, it would be difficult to find 12 jurors who do not have some knowledge of the facts of an important and tragic incident like this one...the pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial.

*Briggs*, 608,Pa. at 466-468, 12 A.3d at 313-314.

In sum, to obtain a change of venue, a defendant must demonstrate that pretrial publicity is inherently prejudicial, that it saturated the community, and that the community did not have sufficient time to cool down from the effects of the publicity. If it is determined that the pretrial publicity is inherently prejudicial and has saturated the community, a trial court must test the "cooling off" period in order to determine whether the prejudicial effects of the publicity have been significantly diluted. Our Supreme Court instructed that we must "investigate what a panel of prospective jurors has said about its exposure to the publicity in question," and "what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective." *Com. v. Robinson*, 581 Pa. 154, 195, 864 A.2d 460, 484 (2004).

The pretrial publicity in this case amounts to approximately thirty-five (35) articles, many of which make reference to police reports and statements by law enforcement personnel regarding the incident. However, these articles were published over the course of four years. At this point, we do not find that Hughes met his burden in demonstrating that the pretrial publicity regarding this case has been so prejudicial as to preclude the empanelling of a fair and impartial jury. Moreover, we find that any potential bias or prejudice on the part of prospective jurors based upon their exposure to pretrial publicity will best be gauged during voir dire. The prospective jurors' responses during voir dire regarding their exposure to media reports and their ability to set aside any preliminary opinions that they may have formed will be telling as to whether the selection of a fair and impartial jury is possible in Northampton County. Accordingly, we deny Hughes' Motion for an immediate change

16

of venue, without prejudice to his right to renew his request for a change of venue based upon the responses of the venire during jury selection.

### B. Motion for Severance Presented by Robinson and Hughes

On September 18, 2015, the Commonwealth filed a Motion to Join Defendants' Criminal Informations for Trial, which both Defendants opposed. On September 28, 2015, Hughes filed a Motion for Severance. On October 9, 2015, this Court held a hearing on the Commonwealth's Motion to Join Defendants' Criminal Informations for Trial and on Hughes' Motion for Severance. By Order of Court, dated October 9, 2015, we granted the Commonwealth's Motion and denied Hughes' Motion. By way of their Omnibus Pretrial Motions, both Defendants now request that their cases be severed.[14]

In his instant Motion for Severance, Hughes contends that a joint trial with Robinson would prejudice him from receiving a fair trial because it may prohibit him from presenting evidence in his defense. Hughes also states that he and Robinson will have antagonistic defenses "where the Jury, in order to believe the testimony offered on behalf of one defendant, must disbelieve the testimony offered by each co-defendant." *See* Hughes' Omnibus Pretrial Motion at ¶ 16. Likewise, in Robinson's Motion for Severance, Robinson contends that if the cases are tried together, he will be prejudiced. Robinson states that the Commonwealth will presumably offer evidence which would not otherwise be admissible against him if the trials were held separately. Specifically, Robinson indicates that the Commonwealth may intend to offer into evidence incriminating statements by Hughes in which Hughes may take responsibility for the crimes charged and may acknowledge that he was in the vicinity of the homicide at the time it occurred.

---

[14] While we already ruled on and denied a Motion for Severance filed by Hughes, we will address herein the Motion for Severance raised by him in the instant Omnibus Pretrial Motions. Since the time that we decided Hughes' first Motion for Severance, we have elicited additional factual evidence at the hearing on the Omnibus Pretrial Motions. Also, because the Commonwealth has an ongoing obligation to provide Defendants with discovery, it is possible that since the time of his initial Motion for Severance, Hughes learned of additional statements and/or other information that the Commonwealth may wish to introduce at the time of trial.

17

As the parties seeking severance, Defendants bear the burden of establishing that the potential for prejudice outweighs the interests served by a joint trial. *Com. v. Housman*, 604 Pa. 596, 619, 986 A.2d 822, 835 (2009), *cert. denied*, 131 S.Ct. 199 (U.S. 2010). The decision to sever co-defendants' trials lies within the discretion of the trial judge whose decision will not be disturbed on appeal absent an abuse of discretion. *Com. v. Birdsong*, 611 Pa. 203, 232, 24 A.3d 319, 336 (2011).

"Where, as here, the crimes charged against each defendant arise out of the same facts and virtually all of the same evidence is applicable to both defendants, [the Pennsylvania Supreme] Court, as well as the United States Supreme Court, have indicated a preference to encourage joint trials to conserve resources, promote judicial economy, and enhance fairness to the defendants." *Com. v. Rainey*, 593 Pa. 67, 94, 928 A.2d 215, 231 (2007). "It would impair both the efficiency and the fairness of the criminal justice system to require that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last trial defendants who have the advantage of knowing the prosecution's case beforehand." *Com. v. Travers*, 564 Pa. 362, 365, 768 A.2d 845, 847 (2001) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). Joint trials also "serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." *Rainey, supra; Com. v. Serrano*, 61 A.3d 279, 285 (Pa. Super. 2013). Moreover, "[w]here, as in the present matter, the defendants have been charged with conspiracy, joint, rather than separate, trials are preferred." *Com. v. Marinelli*, 547 Pa. 294, 313, 690 A.2d 203, 212-213 (1997), *cert. denied*, 523 U.S. 1024 (1998).

In ruling upon a severance request, the trial court should consider the likelihood of antagonistic defenses. *Com. v. Brown*, 592 Pa. 376, 401, 925 A.2d 147, 161 (2007). "A defendant claiming there is a possibility of conflicting or antagonistic defenses 'must show a real potential for prejudice and not just mere speculation.'" *Birdsong*, 611 Pa at 232, 24 A.3d at 336 (quoting *Com. v. Jones*, 542 Pa. 464, 486, 668 A.2d 491, 501 (1995), *cert denied*, 519 U.S. 826 (1996)). Separate

18

trials of co-defendants are appropriate "only where the defenses of each are antagonistic to the point where such individual differences are irreconcilable." *Rainey*, 593 Pa. at 94, 928 A.2d at 232. Further, defenses are considered to be irreconcilable if "the jury essentially would be forced to disbelieve the testimony on behalf of one defendant in order to believe the defense of his co-defendant." *Brown*, 592 Pa. at 401, 925 A.2d at 161-162. However, "the mere fact that there is hostility between defendants, or that one may try to save himself at the expense of another is in itself not sufficient grounds to require separate trials." *Birdsong, supra*. On the contrary, the Supreme Court of Pennsylvania has consistently held "that the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together." *Birdsong, supra*.

As discussed above, Hughes contends generally that severance is warranted because a joint trial may prohibit him from presenting evidence in his defense and because he and Robinson will have antagonistic defenses. In his instant motion, Hughes does not elaborate on any specific newly-discovered evidence since the time of his initial Motion for Severance, nor does he indicate any specific defenses that are "antagonistic to the point where such individual differences are irreconcilable." Hughes' instant request for severance, therefore, is predicated upon an undefined theory of possibilities, and we again will deny same.

Moreover, when we addressed Hughes initial Motion for Severance at the hearing held on October 9, 2015, counsel for the Commonwealth stated the following:

> To my knowledge, there is but one possible statement from anybody [that] implicates the two defendants together. In other words, Mr. Robinson does not give a statement that implicates Mr. Hughes. Mr. Hughes does not give a statement that implicates Mr. Robinson. There is a witness, and he's mentioned in the affidavit of probable cause, that says words to the effect, Mr. Hughes admitted that this was his work and he had his boy "O" do it. He says "O". He never said Omar Robinson. Normally, under *Bruton*, I recall that being redacted or changed to my boy X did it, which would be the standard redaction for that type of statement. That's the only one I'm aware of. I don't think that one statement, which we would be willing to alter in some redacted form, is enough to prevent these two from being joined.

19

N.T., October 9, 2015, at pp. 24-25. Therefore, because Hughes does not specify why a joint trial would be prejudicial and because counsel for the Commonwealth indicated that there is "but one possible statement" that may implicate the Defendants together which statement may be redacted, we find that Hughes does not meet his burden with respect to his request for severance.

Robinson's request is slightly more specific because he indicates that the Commonwealth may intend to offer into evidence incriminating statements by Hughes in which Hughes may take responsibility for the crimes charged and may acknowledge that he was in the vicinity of the homicide at the time it occurred. We nevertheless find that Robinson does not meet his burden of establishing that the potential for prejudice outweighs the interests served by a joint trial. Importantly, at the time of the hearing on the instant Omnibus Pretrial Motions, counsel for Robinson was given an opportunity to argue with respect to Robinson's Motion for Severance. Counsel for Robinson stated: "the only thing I was unclear of is whether or not the issue of the co-defendant's statements was addressed during that argument.[15] I believe the Commonwealth intends to introduce a statement through an informant that Mr. Hughes made some admissions." N.T., 3/7/16, at p. 16. When counsel for Robinson asked whether it was still the intention of the Commonwealth to introduce statements of Hughes that implicate Robinson, counsel for the Commonwealth replied: "There may be a statement, and I understand under *Bruton* that statement would have to be kept out or else it would have to be redacted in some way to get it in. I'm aware of that." *Id.* at p. 170. Counsel for Robinson then stated: "That is my *only* issue with the consolidation whether or not the details of how that would be admitted are going to be. So I guess maybe before we go forward I can clarify with counsel – it doesn't have to be today exactly – what he wants to introduce and I may have a supplemental motion." *Id.* (emphasis added).

We then granted counsel for Robinson time to submit written argument and case law regarding the Motion for Severance; however, he stated that he would need only to submit same

---

[15] Counsel was referring to argument heard on October 9, 2015.

20

pending his conversations with counsel for the Commonwealth. *Id.* at p. 172. This Court never received further argument from Robinson, and as such, we infer that Robinson does not take issue with the cases being consolidated due to any statements that may be offered by the Commonwealth.

We find that Robinson's preliminary hearing transcript, as well as the record made at the hearing on the instant Omnibus Pretrial Motions, reflect that the factual allegations in each matter are categorically intertwined and based upon the same fact pattern. The record reflects that essentially the same testimony and evidence are applicable to Hughes and Robinson, such that a joint trial will foster judicial economy, reduce any inconvenience to witnesses, prevent duplicative trial costs, and avoid inconsistent verdicts, particularly since Hughes and Robinson have both been charged with conspiracy. A single trial will also facilitate the jury's ultimate determination of the truth and enhance a more accurate assessment of the Defendants' relative culpability. For these reasons, the Defendants' motions for severance are denied.

### C. Hughes' Motion to Suppress Statements

As more fully discussed below, Hughes spoke with Detectives on three occasions: December 5, 2012, December 11, 2012 and two years later, on December 4, 2014. With regard to the custodial interrogations that took place on December 5, 2012 and December 4, 2014, we find that Hughes was properly advised of his *Miranda* rights, including the right to have counsel present, and that he waived same prior to these interviews. With respect to the interview conducted on December 11, 2012; however, we find that no such warnings were provided, and the contents of any statements Hughes provided on that date must be suppressed.

Hughes states in his Omnibus Pretrial Motion that he made statements to the Easton Police Department that were uncounseled, elicited in violation of his constitutional rights, and subject to suppression for the following reasons:

21

1. "[a]t the time of his arrest and/or before his arrest, (Hughes) was not properly advised of his rights as required by *Miranda vs. Arizona*, 384 U.S. 436, and was not thereafter advised of rights as required by the circumstances." (Hughes' Omnibus Pretrial Motion at ¶ 56);

2. "(Hughes) did not, at any time before or after arrest, waive any rights, and more specifically did not waive the right to have counsel present at all critical stages of the proceedings." (*Id.* at ¶ 57);

3. "(Hughes) indicated, during questioning, on several occasions, by words and actions, a desire to terminate the questioning process and consult with an attorney. Notwithstanding these facts, the questioning continued, and (Hughes) allegedly made certain incriminating statements thereafter." (*Id.* at ¶ 58);

4. "(Hughes) was not promptly taken before a magistrate for arraignment, and the delay in arraigning (Hughes) was not required for administrative processing purposes." (*Id.* at ¶ 60);

5. "The delay in arraigning (Hughes) was unreasonably long." (*Id.* at ¶ 61);

6. "During the time between arrest and arraignment, Defendant made certain statements to the officers in attendance, which were the product of the lack of proper warnings and the unreasonably long delay between arrest and arraignment." (*Id.* at ¶ 62); and

7. "The statements taken from (Hughes) were obtained by the unlawful actions of the police that resulted in the overbearing of (Hughes') will, and were the result of coercion, resulting from the number and actions of the police involved, the absence of counsel, and all of the surrounding circumstances." (*Id.* at ¶ 63).

Counsel for Hughes did not provide this Court with any additional argument regarding the statements purportedly made by Hughes or the circumstances under which these statements were produced. Therefore, the exact statements to which Hughes refers in his Motion are unclear. At the

22

March 7, 2016 hearing, the Commonwealth elicited credible testimony from the officers involved in the instant homicide investigation regarding certain statements Hughes made to them while he was in custody[16] on December 5, 2012, December 11, 2012, and December 4, 2014.

"To safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects subject to custodial interrogation by law enforcement officers must be warned that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney." *In re R.H.*, 568 Pa. 1, 5, 791 A.2d 331, 333 (2002) (plurality); *see also Miranda v. Arizona*, 384 U.S. 436, 444-445 (1966). With regard to the waiver of *Miranda* rights, the Pennsylvania Superior Court has explained the following:

> *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

*In the Interest of T.B.*, 11 A.3d 500, 505 (Pa. Super. 2010) (citing *Com. v. Cephas*, 522 A.2d 63, 65 (Pa. Super. 1987).

Our Supreme Court has provided that:

> An explicit statement of waiver after being advised of [one's] *Miranda* rights ... is not necessary to a finding of waiver under the Fifth Amendment. The pertinent question is whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. Waiver can be clearly inferred from the actions and words of the person

---

[16] Hughes spoke to the police on only one occasion while he was not in custody. Specifically, Detective Snyder testified that he first spoke with Hughes about this case on the telephone on December 5, 2012. N.T., 3/7/16/ at p. 93. With respect to this initial interaction between Detective Snyder and Hughes, Detective Snyder testified that Hughes agreed, over the telephone, to meet with him and/or members of the Easton Police Department at a park in Easton. *Id.* at pp. 93, 113-114. We heard no testimony that Hughes made any other statements to the police prior to his arrest, which took place on that same day, December 5, 2012, as a result of the vice investigation. Because this initial interaction was over the phone, and Hughes voluntarily appeared to meet with Snyder at the aforementioned park, it cannot be argued, and counsel for Hughes does not argue, that Hughes was physically deprived of his freedom in any significant way or was placed in a situation in which he reasonably believed that his freedom of action or movement is restricted by the interrogation. *See Com. v. Nester*, 709 A.2d 879, 882 n. 4 (1998) (citations omitted). Therefore, because this interaction was not custodial, *Miranda* warnings were not required. *See id.*

23

interrogated.

*Com. v. Bomar*, 573 Pa. 426, 447, 826 A.2d 831, 843 (2003) (internal citations and quotes omitted).

> The test for determining ... whether an accused knowingly waived his or her rights looks to the totality of the circumstances ... Some of the factors to be considered include: the duration and means of interrogation; the accused's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any and all other factors which may serve to drain one's powers of resistance to suggestion and coercion.

*Com. v. Jones*, 546 Pa. 161, 178, 683 A.2d 1181, 1189 (1996) (internal citations omitted).

With respect to the totality of the circumstances of the instant matter, it is clear that Hughes was in custody during any statements he made to the police, and therefore, the warnings articulated by *Miranda* were mandatory.

## The December 5, 2012 Statements

On December 5, 2012,[17] when Hughes was taken into custody as a result of the vice investigation, Detective Snyder issued *Miranda* warnings prior to interviewing Hughes at the Easton Police Department. N.T., 3/7/16, at pp. 93-94. Detective Snyder testified that only about one hour passed between the time Hughes was arrested and the time he was brought into the interview room for questioning, and we heard no testimony that Hughes was questioned or that he provided any statements to the police in this interim. *Id.* at pp. 116-118. Prior to the interview, Detective Snyder filled out a standard rights waiver form used by the Easton Police Department, and Hughes signed this form. *Id.* at 96.

The first part of the form indicates the location, date, and time at which the interview is occurring, as well as the Easton Police incident number and the person being interviewed. *Id.* at pp. 97, 99. The next section of the form is the waiver, which includes two parts: 1. a paragraph indicating that the individual understands his/her rights which they are waiving, and 2. a paragraph

---

[17] This date is approximately one week following the drug investigation and the homicide, both of which occurred on the same date. N.T., 3/7/16, at p. 98.

24

indicating that the individual wishes to waive their rights.[18] *Id.* at pp. 97-98. Hughes executed this waiver twice, indicating that he understood his rights and that he wished to waive same. *Id.* This waiver, which evidences Hughes' signatures, was admitted into evidence at the March 7, 2016 hearing as Commonwealth Exhibit 9. Detective Snyder testified that after he read this form to Hughes, Hughes verbally stated to him that he was willing to speak to him. *Id.* at p. 101.

During the December 5, 2012 interview, Detective Snyder testified that Detective Rush was also present and that the entirety of this interview, including Hughes' waiver of his *Miranda* rights, was audio and video recorded. *Id.* at pp. 98-99, 101, 118. Detective Snyder explained to Hughes that he wanted to talk to him about the instant homicide which was under investigation. *Id.* at p. 101. At this time, Hughes denied any involvement with the homicide whatsoever. As discussed *supra*, it was during this interview, which lasted approximately forty-five minutes to one hour, that Hughes provided several different alibis. *Id.* at pp. 102-107.

### The December 11, 2012 Statements

On December 11, 2012, Detective Snyder interviewed Hughes while he was incarcerated in the Northampton County Prison. This interview lasted approximately thirty minutes, and a subsequent Rights and Waiver form was not completed on this date. While we heard no evidence on direct or cross examination regarding any specific statements that Hughes provided during this

---

[18] Detective Snyder read the contents of the form waiver into the record as follows:

> It states that my name is Detective Darren Snyder of the Easton Police Department. I wish to advise you that you have an absolute right to remain silent; that anything you say can and will be used against you in a court of law; that you have a right to talk to an attorney before and have an attorney present during the questioning; that if you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire; ... that if you do decide to answer any questions, you may stop at any time you wish.

*Id.* at p. 100. Detective Snyder indicated that the next part of the form, which was signed by Hughes, reads as follows:

> I fully understand the statement advising me of my rights and I'm willing to answer questions. I do not want an attorney, and I understand that I may refuse to answer anytime during questioning. No promises have been made to me nor have any threats been made against me.

*Id.* at pp. 100-101.

25

interview, Detective Snyder testified that Hughes again denied any involvement in the homicide, but did provide new information with respect to Hutchinson.

Detective Snyder conceded that Hughes did not sign a Rights and Waiver form prior to this interview, and we heard no testimony that he informed Hughes of his *Miranda* rights. While there is no "prophylactic rule" that a defendant must be again warned of his *Miranda* rights every time a custodial interrogation is held, "repeat warnings are necessary where the initial warnings have become stale or remote." *Com. v. Scott*, 561 Pa. 617, 752 A.2d 871, 875 (2000). The *Scott* Court declared that factors relevant to whether *Miranda* warnings have become stale or remote were provided in *Commonwealth v. Bennett*, 445 Pa. 8, 15, 282 A.2d 276, 280 (1971), and are:

> [T]he length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether the statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Com. v. Cohen*, 53 A.3d 882, 888 (Pa. Super. 2012) (citing *Scott supra.*).

In the present case, although Detective Snyder was present at both the December 5, 2012 and December 11, 2012 interviews, there was no "clear continuity" between the two interviews. *See Com. v. Hoss*, 445 Pa. 98, 112, 283 A.2d 58, 66 (1971). These interviews occurred in different locations, and most notably, the December 11, 2012 interview occurred six days after Hughes was last informed of his *Miranda* rights on December 5, 2012. Our Supreme Court's decisions in *Com. v. Wideman*, 460 Pa. 699, 334 A.2d 594 (1975), and *Com. v. Riggins*, 451 Pa. 519, 304 A.2d 473 (1973), held that time lapses of twelve and seventeen hours, respectively, necessitated the renewal of *Miranda* warnings. Clearly, a six day lapse in time between warnings and an interrogation does so as well.

Moreover, during the December 11, 2012 interview, Hughes provided new information with respect to Hutchinson, and therefore, at least one statement provided by Hughes was "materially different" from anything he provided in the prior interview. Accordingly, assessing the *Bennett*

26

factors above, we conclude that the *Miranda* warnings given on December 5, 2012 were stale and new warnings were required prior to the December 11, 2012 interview of Hughes. As no such warnings were provided, we must suppress Hughes' statement given on December 11, 2012.

### The December 4, 2012 Interview

Finally, Detective Snyder conducted a third interview of Hughes on December 4, 2014 at the Detective's office in the Northampton County District Attorney's office, which is located in the Northampton County Courthouse. N.T., 3/7/16, at pp. 109-110.[19] There were no other detectives present during this interview. *Id.* at p. 111. As indicated above, this interview took place on the date that Hughes was served with a warrant for the instant homicide. *Id.* at p. 108. Prior to this interview, Detective Snyder presented Hughes with another Rights and Waiver form which was, in all material aspects, identical to the one described *supra*. *Id.* at pp. 109-110. Detective Snyder also read the contents of the form verbatim to Hughes. *Id.* at p. 110. Hughes again signed the portions of the form that stated that he understood his *Miranda* rights, that he was waiving his *Miranda* rights, and that he was willing to speak without an attorney present. *Id.* We heard no testimony indicating that Hughes wished to have an attorney present during the course of this interview, and when Hughes asked to return to his cell, Detective Snyder honored Hughes' request and terminated the interview. *Id.* at p. 113.

Unlike the custodial interrogation that took place on December 11, 2012, it is clear that Detective Snyder issued *Miranda* warnings to Hughes prior to the custodial interrogations that took place on December 5, 2012 and December 4, 2014. Via the "Rights and Waiver" form, Detective Snyder read these warnings aloud to Hughes and asked if Hughes understood his rights. Hughes' first signature on each form confirmed that he understood his rights; Hughes' second signature on each form, as well as Hughes' verbal response to Detective Snyder, confirmed that Hughes wished to

---

[19] Hughes was already incarcerated at this time, so for purposes of the interview, he was brought to the Northampton County Courthouse from the prison to be processed for the homicide charges. *Id.* at p. 109.

27

waive his rights. Significantly, our Superior Court has held that "after a defendant is given his or her *Miranda* rights, a statement by the defendant that he understands those rights followed by the answering of questions posed by the interrogating officer constitutes a sufficient manifestation of a defendant's intent to waive those rights so as to satisfy state constitutional protections." *Com. v. Baez*, 21 A.3d 1280, 1286 (Pa. Super. 2011) (footnote omitted).

In light of the fact that Hughes verbally, and in writing, acknowledged that he understood his *Miranda* rights on two occasions and did not request an attorney during the interviews on December 5, 2012 and December 4, 2014, we conclude that, under the totality of the circumstances, any custodial statements made by Hughes were the product of a voluntary, knowing, and intelligent waiver of his *Miranda* rights. Beyond a broad allegation that his statements were not voluntarily made to Detective Snyder, Hughes has not presented anything contradictory to the Commonwealth's evidence that would suggest Hughes executed the waivers in any way except knowingly, intelligently, and voluntarily. Therefore, Hughes' motion to suppress his statements on these grounds must be denied.

Lastly, we find no merit with regard to Hughes' argument that he made certain statements to officers during the time between he was arrested and arraigned and that these statements were the product of a lack of proper warnings and unreasonably long delay between arrest and arraignment. Our Supreme Court has held that "voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible *per se*. Rather, ... *regardless of the time of their making*, courts must consider the totality of the circumstances surrounding the confession." *Com. v. Housman*, 604 Pa. 596, 627, 986 A.2d 822, 840 (2009) (internal citation omitted) (emphasis added).

28

We have already addressed the one custodial interrogation which occurred subsequent to Hughes' arrest on the homicide charges and prior to his arraignment,[20] the fact that Hughes executed a Rights and Waiver form prior to this interview, and the totality of the circumstances regarding this interview. Hughes has not identified any other statements that he made to officers during the time between his arrest and arraignment. Without any specification from Hughes regarding what statements were made and under what conditions, we cannot rule that any and all statements made by Hughes are inadmissible.

### D. Defendants' Motions to Suppress Evidence from the Search of the Minivan

In Robinson's Motion, he asks this Court to suppress the gunshot residue found during the search of the minivan on November 28, 2012, as well as all subsequent evidence seized from the minivan pursuant to a search warrant, which warrant was procured as a result of the detectives' reliance on the gunshot residue found during the initial search. Robinson argues that the gunshot residue was acquired as a result of an unlawful search and seizure because he had an expectation of privacy in the minivan, and Detectives Rush and Miller conducted a search of the minivan without a warrant or his consent to search it. Further, Robinson contends that, prior to the search, the police had neither probable cause nor reasonable suspicion that the minivan contained any evidence of a crime.

Similarly, Hughes argues in his Motion that the gunshot residue found in the minivan as a result of the November 28, 2012 search was the product of an unconstitutional search and should be suppressed. Hughes contends that Detectives Rush and Miller did not obtain valid consent to search the minivan because the minivan is owned by Barbara Doorley, not Lisa Doorley, who provided the alleged consent. Further, Hughes maintains that even if Lisa Doorley did have authority to provide

---

[20] This one custodial interrogation was the one that occurred on December 4, 2014. The December 5, 2012 interview occurred after Hughes was arrested as a result of the vice investigation, not the homicide investigation.

consent to search the minivan, her consent was coerced because a reasonable person would not conclude that Robinson and Ms. Doorley were free to leave when the detectives were questioning them prior to the search.

The Commonwealth argues first that Hughes does not have standing to raise this suppression issue because he possessed neither a proprietary nor a possessory interest in the minivan that was searched as it belonged to Ms. Doorley and Robinson. The Commonwealth also argues that the underlying police encounter was lawful and that Ms. Doorley provided the police with a valid consent to search the minivan. Contrary to the assertions of Robinson and Hughes, we find that the November 28, 2012 search was constitutional and decline to suppress the gunshot residue found as a result.

When proffering a motion to suppress, a defendant shall ensure that the motion states "specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof." Pa.R.Crim.P. 581(D). In a motion to suppress, the applicable burden of persuasion is upon the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible and not obtained in violation of the defendant's rights. *Com. v. Beaman*, 846 A.2d 764, 767 (Pa. Super. 2004) aff'd, 583 Pa. 636, 880 A.2d 578 (2005); *see also Com. v. West*, 834 A.2d 625 (Pa. Super. 2003). In ruling on a defendant's motion to suppress, this Court is required to "make findings of fact and conclusions of law as to whether evidence was obtained in violation of the Defendant's [C]onstitutional rights." *Com. v. Haynes*, 577 A.2d 564, 570 (Pa. Super. 1990); *see also* Pa.R.Crim.P. 581(I). Moreover, as this Court has the "sole province as [the] fact finder to pass on [the] credibility of witnesses and [the] weight to be given to their testimony," this Court is free to believe all, some, or none of the evidence presented. *Com. v. Elmoby*, 823 A.2d 180, 183 (Pa. Super. 2003).

While the Commonwealth has the burden of proof to establish that the challenged evidence is admissible and not obtained in violation of the defendant's rights, "a defendant cannot prevail upon a

30

suppression motion unless he demonstrates that the challenged police conduct violated his own, personal privacy interests." *Com. v. Milner*, 888, A.2d 680 (Pa. 2005). Therefore, while the Commonwealth must show that the search and/or seizure was constitutional, the defendant must demonstrate an expectation of privacy in the area searched in order to succeed on his motion. *Com v. Peterson*, 17 A.3d 935 (Pa. Super. 2012); *Com. v. Hawkins*, 553 Pa. 76, 718 A.2d 265 (1998).

It is well settled that an expectation of privacy is present when an individual "exhibits an actual (subjective) expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable." *Com. v. Burton*, 973 A.2d 428, 435 (Pa. Super. 2009) (quoting *Com. v. Jones*, 874 A.2d 108, 118 (Pa. Super.2005) (citations omitted)). Therefore, a subjective privacy expectation must be coupled with objective reasonableness. *Hawkins, supra.* at 267 n. 1. The constitutional legitimacy of an expectation of privacy is dependent upon whether the expectation is reasonable in light of all the surrounding circumstances. *Burton, supra.* at 435 (quoting *Commonwealth v. Jones*, 874 A.2d 108, 118(Pa. Super. 2005) (citations omitted)).

### Hughes Had No Expectation of Privacy

There is no evidence whatsoever establishing an expectation of privacy in the minivan on the part of Hughes. Specifically, Hughes did not present evidence that he used the vehicle with authorization or permission of the registered owner. In fact, Hughes has denied his presence in the minivan on the date in question, and does not otherwise explain his connection to the vehicle or its owner. *See Burton*, 973 A.2d at 436; *see also Com. v. Maldonado*, 14 A.3d 907 (Pa. Super. 2011) (holding that a driver of a car registered to his girlfriend did not prove a reasonable expectation of privacy in his girlfriend's car where neither he nor his girlfriend testified that he had permission to use the car). Consequently, we must deny this Motion as to Hughes for lack of an expectation of privacy in the minivan. We will analyze the merits of this Motion regarding whether the search of the minivan and seizure of the gunshot residue was proper only as to Robinson.

31

<u>There Was Valid Consent To Search Vis-a-Vis Robinson</u>

The Commonwealth contends that Detectives Rush and Miller did not need a warrant to search the minivan because: 1) they received valid consent from Ms. Doorley; and 2) the consent was given voluntarily during a "mere encounter" as opposed to an investigative or custodial detention. We agree.

Pursuant to Fourth Amendment protections, before an officer may conduct a search, he must generally obtain a search warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A warrant is not required, however, where a person with the proper authority unequivocally and specifically consents to the search. *Com. v. Strickler*, 563 Pa. 47, 757 A.2d 884, 888 (2000). "A person has authority to consent to a search if the person has a possessory or privacy interest in the area to be searched or the person has either explicitly or implicitly been granted permission to give consent by a person with a possessory or privacy interest in the area to be searched." *Com. v. Reid*, 571 Pa. 1, 25, 811 A.2d 530, 544 (2002).

In the instant case, Ms. Doorley was an individual with authority to consent to a search of the minivan because she had a clear possessory interest in the minivan. While Ms. Doorley's mother had title to the minivan, Detective Miller testified that Ms. Doorley told him that the only reason the minivan was in her mother's name was because her mother had to purchase it for credit reasons and that she (Ms. Doorley) is the primary driver of the van. N.T., 3/7/2016, at pp. 64, 88. Ms. Doorley indicated to Detective Miller that the minivan was hers as she was the primary day-to-day operator of the van, which she keeps at her residence. N.T., 3/7/16, at pp. 44, 88. Ms. Doorley also indicated to the detectives that she was the individual who was financially responsible for the minivan. *Id.* at p. 43. This is further bolstered Detective Rush's testimony that Robinson stated to him, "I don't loan my van to anybody. Either I drive it or she, Lisa, drives it." *Id.* at p. 54; N.T., 4/29/15, at p. 83.

We find that Ms. Doorley had authority to consent to the search. We now turn to the question of whether her consent to search the minivan was valid. To establish a valid consensual

32

search, the Commonwealth must first prove that the consent was given during a legal police interaction; second, if the underlying encounter is found to be lawful, the Commonwealth must then prove that the consent was given voluntarily. *Com. v. Strickler*, 563 Pa. 47, 57, 757 A.2d 884, 889 (2000).

Not every encounter with the police "is so intrusive as to trigger constitutional protections." *Com. v. Boswell*, 554 Pa. 275, 283, 721 A.2d 336, 340 (1998) (citations omitted). Therefore, "'[i]nteraction' between citizens and police officers, under search and seizure law, is varied and requires different levels of justification depending upon the nature of the interaction and whether or not the citizen is detained." *Com. v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2006) (citation omitted). Pennsylvania courts recognize three such levels of interaction: "mere encounters," "investigative detentions," and "custodial detentions." *Id.* A "mere encounter" is a request for information which does not need to be supported by any level of suspicion; however, it carries no official compulsion to stop or respond. *Reid, supra.* at 26. An "investigative detention" subjects a person to a stop and a period of detention and must be supported by reasonable suspicion. *Id.* A "custodial detention" is an arrest and must be supported by probable cause. *Id.*

We find that the interaction between Ms. Doorley and Detectives Miller and Rush was a mere encounter because she was not compelled to answer the detectives' questions; she could have terminated the encounter at any time. This is supported by the following testimonial evidence in the record:

> Earlier in the day, Detective Rush called Ms. Doorley on the phone. He indicated to her during their phone conversation that he was conducting an investigation and that he would like to speak with her about the minivan. N.T., 3/7/2016, at p. 38; N.T., 4/29/15, at p. 75. Detective Rush arranged to meet with Ms. Doorley at her house, and she gave him her address and indicated the time she would arrive home that evening. Detectives Miller and Rush arrived, in plain clothes, at Ms. Doorley's residence at the time she specified. N.T., 3/7/16, at p. 27. After arriving at the residence, Ms. Doorley invited the detectives inside. *Id.* at p. 29. Eventually, the detectives spoke to Ms. Doorley about obtaining her consent to search the minivan. *Id.* at pp. 32-33. Ms. Doorley indicated that "she would be fine with that," and provided the detectives with the keys to the minivan. *Id.* at p. 33.

Upon consideration of the foregoing facts, the interaction between the detectives and Ms. Doorley was a lawful consensual encounter. We now must turn to the issue of whether Ms. Doorley's consent was made voluntarily under the circumstances surrounding the consent.

Detective Rush further testified that Ms. Doorley also provided her written consent after verbally consenting to the detectives searching the minivan. *Id.* Per standard procedure, Detective Rush read the consent form aloud to Ms. Doorley and also indicated that she could revoke her consent at any time during the search. *Id.* at pp. 46-47. While Detective Miller conducted the search of the vehicle, Detective Rush stood by Ms. Doorley, approximately ten feet away from the vehicle, just in case she wished for Detective Miller to terminate the search. *Id.* at pp. 35-36, 46. During this time, Detective Rush and Ms. Doorley made casual conversation, and at no time did Ms. Doorley revoke her consent to search the vehicle. *Id.* at p. 36. Importantly, Robinson, who went back inside of the residence, never indicated that he did not want the detectives to search the minivan. *Id.* at pp. 42-43.

There is no evidence in the record that the detectives coerced Ms. Doorley into providing consent to search the minivan. To the contrary, the detectives told her that she had the right to revoke her consent. Further, we do not find anything in the record that indicates that Ms. Doorley misunderstood her rights, which were indicated on the consent form and read aloud to her. As discussed above, Ms. Doorley was cooperative and conversational with the detectives. Thus, upon our review of the circumstances under which Ms. Doorley provided her consent, we conclude that her consent was made voluntarily.

Finally, we note that Detective Rush testified that although Ms. Doorley's written consent form has since been misplaced and cannot be located, he undoubtedly witnessed Ms. Doorley sign same prior to the search of the minivan. *Id.* at p. 34-35. With respect to any contention raised by Defendants that the consent form is not physically available in order to be made part of the record, we note that, under Pennsylvania law, there is no requirement that a consent search be memorialized

34

by a signed written consent. *Com. v. Gibbons*, 549 A.2d 1296 (Pa. Super. 1988) (citing *Com. v. Markman*, 467 A.2d 336 (Pa. Super. 1983). As stated *supra*, a valid consent search requires only that the consent be voluntary and not the result of duress, force, or coercion. *See, id.*

## E. Habeas Corpus

Robinson and Hughes have each filed a petition for habeas corpus. Defendants contend that the Commonwealth is unable to present sufficient facts and evidence to sustain a *prima facie* case against them.

"The writ of habeas corpus exists to vindicate the right of personal liberty in the face of unlawful government deprivation." *Com. v. Jackson*, 809 A.2d 411, 416 (Pa. Super. 2002) (internal citations and quotations omitted). A writ of habeas corpus allows a defendant to challenge the validity of the Commonwealth's evidence to sufficiently establish the charges against them. "A trial court may grant a defendant's petition for habeas corpus when the Commonwealth has failed to present a *prima facie* case against the defendant." *Com. v. Santos*, 583 Pa. 96, 100, 876 A.2d 360, 362 (2005).

The Commonwealth does not need to establish their case beyond a reasonable doubt, but need merely establish a *prima facie* case, which consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes "the commission of a crime and that the accused is probably the perpetrator of that crime." *Com. v. Hendricks*, 927 A.2d 289, 291 (Pa. Super. 2007); *Com. ex rel. Lagana v. Office of Attorney Gen.*, 662 A.2d 1127, 1129 (Pa. Super. 1995). The evidence must be sufficient enough that if it were "presented at trial and accepted as true, the trial judge would be warranted in allowing the case to go to the jury." *Id.* In an effort to meet its burden, the Commonwealth may utilize the evidence presented at the preliminary hearing and also may submit additional proof. *Com. v. Morman*, 541 A.2d 356, 359 (Pa. Super. 1988). With respect to any additional evidence, it is within this Court's "sole province as [the] fact finder to pass on the

35

credibility of witnesses and the weight to be given to their testimony." *Com. v. Elmoby*, 823 A.2d 180, 183 (Pa. Super. 2003). Therefore, this Court is free to believe all, some, or none of the evidence presented.

## Robinson's Petition

We first address Robinson's contention that the Commonwealth is unable to prove a *prima facie* case against him for the offenses of criminal homicide and conspiracy to commit criminal homicide in the death of Holton. After hearing testimony at our March 7, 2016 Omnibus Pretrial Hearing, reviewing the transcript of the preliminary hearing of Robinson, and viewing the evidence and all reasonable inferences arising from the evidence in the best light to the Commonwealth, we find that the prosecution established a *prima facie* case. The evidence presented established that a crime had been committed and that *both* Defendants were probably the persons who committed it. The testimony of the witnesses presented at the preliminary hearing, including Sergeant Richard Weber, Zachary Lysek, Detective Rush, Detective Miller, and Detective Snyder, as well as the testimony of Graves and the subsequent testimony provided by Detectives Rush, Miller, and Snyder at our March 7, 2016 hearing on the instant Motions, establish circumstantially that the Defendants probably caused the shooting death of Holton on November 23, 2012.

As stated above, Robinson is charged with Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501, for intentionally, knowingly, recklessly or negligently causing the shooting death of Ervin Holton on November 23, 2012. Hughes is charged with Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501, for soliciting Robinson to commit the offense of the aforementioned criminal homicide and/or aiding, agreeing, or attempting to aid Robinson in planning or committing same. Both Defendants are also charged with Criminal Conspiracy to Commit Criminal Homicide, in violation of 18 Pa.C.S.A. § 903 A1, for conspiring with the other to cause the death of Ervin Holton.

A person commits the crime of Criminal Homicide and violates 18 Pa. C.S. § 2501 (a) "if he intentionally, knowingly, recklessly or negligently causes the death of another human being." To

36

sustain a criminal conspiracy conviction, the Commonwealth must establish that a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903;[21] *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1030 (1996) (citations omitted). The overt act need not accomplish the crime - it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. *Com. v. Weimer*, 602 Pa. 33, 38–39, 977 A.2d 1103, 1105–06 (2009). On behalf of both Defendants in this case, we find the evidence more than sufficient to support a *prima facie* case for the offenses of Criminal Homicide and Conspiracy to Commit Criminal Homicide.

At the Omnibus Pretrial Hearing, we heard evidence that detectives from the Easton Police Department reported to a residence on the south side of Easton in response to a 911 call that was made at approximately 5:41 p.m. on November 23, 2012. At the scene, the detectives identified Holton as the victim. The coroner determined that the cause of death was a homicide by multiple gunshot wounds.

Detectives Miller and Rush testified regarding video surveillance from approximately 5:39 p.m. to 5:41 p.m. on the evening of the shooting, depicting two individuals exit a dark-colored minivan about a block away from the crime scene, walk in the direction of the scene, and run back toward the minivan to drive away minutes later. The Commonwealth also presented evidence that Robinson and Hughes were probably the individuals seen in the video surveillance as Robinson's girlfriend, Ms. Doorley, was the owner of a dark-colored minivan. When Detectives Miller and Rush went to Robinson's home to search the minivan, Robinson indicated that he was the operator of the

---

[21] Section 903 provides, in relevant part:
(a) *Definition of conspiracy.*-A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime ...

minivan on the date of the homicide, and he became emotional when he was questioned further about the incident. Additionally, a search of the minivan revealed that gunshot residue was found on the steering wheel and the driver's side interior door handle.

Further, cell phone records confirmed that Robinson and Hughes had been making several phone calls between themselves and Reavis just before the time of the homicide, but at around 5:39 p.m. – just before the time the 911 call was made and the same time that the video surveillance showed the individuals exiting the minivan – all calls between them ceased, to resume again only five minutes following the shooting. The cell phone records also evidenced that Robinson and Hughes were in close proximity to one another when the calls were made because the calls were being transmitted from the cell tower located on the south side of Easton.

We heard additional testimony that Robinson and Hughes were together during the afternoon on the date of the homicide. Specifically, the vice unit of the Easton Police Department was investigating Hughes on that day, and as a result of this vice investigation, photographs were taken showing that Robinson and Hughes were together near the residence of Corey Reavis. Reavis informed the police that he had driven Holton to the area where he was shot. Additional testimony revealed that Holton was in that area in order to see his female friend Janine Edwards.

The police investigation further disclosed that Hughes had provided several different alibis, none of which the detectives could substantiate. Additionally, testimony from Graves, a prisoner who shared transport with Hughes during incarceration, indicated that Hughes boasted to him about the fact that he had prepared an alibi for the time of the homicide. Graves further testified that Hughes told him that his ex-girlfriend "got with another guy" who might have been a rival drug dealer in Easton. After the "guy" continued to talk to the girl, Hughes told Graves that "his mans handled that."

Clearly, the foregoing testimony and evidence supports a *prima facie* finding that both Robinson and Hughes played a vital and supportive role in the events which led to the death of

38

Holton. Specifically, the evidence supports a *prima facie* case that Robinson shot Holton and that Hughes arranged for the shooting to happen and potentially took part in said shooting. With all inferences and issues of credibility properly weighed in favor of the Commonwealth, we conclude that a *prima facie* case of Criminal Homicide and Criminal Conspiracy has been established against the Defendants and the Petition for Writ of Habeas Corpus and/or to quash the information must properly be denied.

## Hughes' Petition

Next, we address Hughes' petition. Hughes' petition is based primarily on the fact that no preliminary hearing transcript has been made available with respect to him and that "holding (him) violates his right to be free from unreasonable seizures of the person as guaranteed by the Fourth and Fourteenth Amendments of the United States…". *See* Hughes' Omnibus Pretrial Motion at ¶ 39. He asserts that a Preliminary Hearing was held before Magisterial District Judge Joseph Corpora on or about June 19, 2015 and that "[i]t is remarkable that although the Preliminary Hearing was held …, there was no Court Stenographer requested by Preliminary Hearing Council [sic] Jack McMahon and no Preliminary Hearing Transcript of the proceedings exist." *Id.* at ¶¶ 36-37. As a result of the lack of a preliminary hearing transcript, Hughes contends that "it is absolutely necessary in order to facilitate due process for your Defendant that this matter be remanded and the Writ of Habeas be granted for a new proceeding and Preliminary Hearing consistent with the Rules of Criminal Procedure." *Id.* at ¶ 41.

Hughes does not argue that he was not afforded a preliminary hearing; rather, he argues that a transcript of same was not made available. Nevertheless, there is no constitutional right, federal or state, to a preliminary hearing. *Com. v. Mayberry*, 459 Pa. 91, 327 A.2d 86 (1974); *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Com. v. McCloskey*, 443 Pa. 117, A.2d 764 (1971); *Cf. Com. ex rel. Fitzpatrick v. Mirarchi*, 481 Pa. 385, 392 A.2d 1346 (1978). "The principal function of a preliminary hearing is to protect the individual against unlawful detention.

39

The prosecution, therefore, has the burden of establishing at least *prima facie* that a crime has been committed and the accused is the one who committed it." *Com. v. Ruza*, 511 Pa. 59, 64, 511 A.2d 808, 810 (1986) (internal citations and quotations omitted).

We have determined above that the testimony and evidence presented at Robinson's preliminary hearing and at the Omnibus Pretrial Hearing overwhelmingly indicate that a *prima facie* case exists against Robinson and Hughes. Therefore, notwithstanding the lack of a preliminary hearing transcript with respect to Hughes, there has been ample evidence adduced at the aforementioned hearings to establish a *prima facie* case against Hughes. As such, the safeguards that a preliminary hearing would afford Hughes were observed. *Com. v. Hess, 489 Pa. 580, 590, 414 A.2d 1043, 1048 (1980)* (holding that if it is determined at trial that the evidence of the Commonwealth is sufficient to be submitted to the jury, then any deficiency in the presentation before the district justice would have been harmless). *See also Morman*, 541 A.2d at 360 ("If the habeas corpus court determines that a prima facie case in fact exists against an individual, then the individual has obtained a judicial review of the legality of the government's restraint upon his personal liberty.")

Accordingly, Hughes' motion for habeas corpus will be denied on this basis.

III.    Conclusion

For the foregoing reasons, with the exception of Hughes' motion to suppress statements made by him on December 11, 2012 only, all other Defendants' Omnibus Pretrial Motions are DENIED. An appropriate Order follows.

BY THE COURT

JENNIFER R. SLETVOLD, J.

40